Ignacio CUEVAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 69178.

Court of Criminal Appeals of Texas, En Banc.

July 1, 1987.

Will Gray, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Frank Blazek, William J. Delmore, III and Bert Graham, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appeal is taken from a third conviction for capital murder.[1] Appellant was convicted of intentionally and knowingly causing the death of Julia Standley. Her death occurred while appellant and others were attempting to escape from a penal institution. V.T.C.A., Penal Code Sec. 19.03(a)(4). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071, V.A.C.C.P. Punishment was for the third time assessed at death. This cause is before us on direct appeal pursuant to Art. 37.071(h), V.A.C.C.P. We affirm.

Appellant initially raises five points of error. He challenges: the excusal of one venireman; the denial of fourteen of his challenges for cause; the procedures used in selecting the jurors; and the court's refusal to instruct the jury that the law of parties does not apply to special issue number one. Appellant does not contest the sufficiency of the evidence to support his conviction or the affirmative findings on the special issues. However, a brief review of the facts is necessary to provide the context for three of appellant's points of error.

On July 24, 1974, three inmates of the Texas Department of Corrections seized control of a third floor educational area in the Walls Unit at Huntsville. For eleven days the armed inmates, Frederico Carrasco, Rudolpho Dominguez, and appellant, held hostages taken at the time of the seizure. The original hostages included eleven employees of the TDC and Windham School District, a TDC guard, and a number of inmates. Eventually, two teachers were released and only four inmates remained as hostages. Joseph O'Brien, a prison chaplain who had been acting as a messenger, chose to remain as a hostage.

The eleven-day ordeal was marked by negotiations and threats of violence. As a result of the negotiations, TDC officials provided the inmates with certain materials for their escape. The inmates built a shield by taping law books around chalkboards. The inmates planned to escape by moving

---

1. The offense was committed in 1974, while appellant was incarcerated on a conviction for murder with malice aforethought. In 1975 appellant was convicted of capital murder and sentenced to death. This Court reversed his conviction because appellant's challenge for cause to a venireman was improperly overruled. *Cuevas v. State*, 575 S.W.2d 543 (Tex.Cr.App. 1978). Appellant was re-tried and convicted a second time of capital murder. This Court reversed the conviction because the State's challenge for cause to a venireman was improperly granted. *Cuevas v. State*, 641 S.W.2d 558 (Tex. Cr.App.1982).

along, while inside the shield, to a waiting armored car. Several hostages were handcuffed to the exterior of the shield by the inmates, who wore heavy metal helmets. For additional protection each inmate handcuffed a female hostage to himself, with the announced intention of shooting the hostages if an attempt to stop the escape was made. The inmate-hostage pairings were as follows: Mrs. Novella Pollard was handcuffed to appellant; Mrs. Julia Standley to Dominguez; Mrs. Vonne Beseda to Carrasco. O'Brien was also inside the shield with the three inmates and their hostages.

On the evening of August 3, 1974, the inmates attempted their escape. When law enforcement officers acted to prevent the escape, gunfire erupted. In the end, appellant's two co-conspirators and two of the female hostages were dead. Appellant, his female hostage, and O'Brien survived. Appellant was indicted for the death of Standley. The bullets that killed Standley were fired from Dominguez' pistol, which was found on his body.

In his third, fourth, and fifth points of error, appellant complains about the jury selection process. The voir dire took thirty (30) courtroom days during March 21, 1983 to May 11, 1983.[2] The interrogation of the veniremen covers approximately 5800 pages in the record.

### I.

■ In his third point of error, appellant contends the trial court erred by granting the State's challenge for cause to venireman Glenda Davis. The State challenged Davis because of her opposition to the death penalty. Art. 35.16(b)(1), V.A.C.C.P. Appellant objected to her excusal as a violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In other opinions we have discussed the United States Supreme Court's modification of the standard to be used for these

situations. *See, e.g., Ex parte Russell,* 720 S.W.2d 477, 481–485 (Tex.Cr.App.1986); *Sharp v. State,* 707 S.W.2d 611, 620 (Tex. Cr.App.1986). Thus, we state the standard here without embellishment. In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court instructed that the standard is whether the venireman's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 105 S.Ct. at 852. Moreover, the venireman's bias need not be shown with "unmistakable clarity" because appropriate "deference must be paid to the trial judge" who had the opportunity to observe the demeanor of the venireman. *Id.* at 852–53.

With this standard in mind we examine the interrogation of Davis. As with all reviews of a ruling on a challenge for cause, we look to the record of the voir dire as a whole. *McCoy v. State,* 713 S.W.2d 940, 951 (Tex.Cr.App.1986). Initial questioning by the trial court was as follows:

"Q: Do you have any moral, conscientious or religious scruples against the assessment of death as punishment for crime in a proper case?

"A: *I do not believe in the death penalty.*[3]

"Q. Under any circumstances?

"A: No, sir."

\* \* \* \* \* \*

"Q: ... [Y]ou are convinced beyond a reasonable doubt that the defendant is guilty as charged. Would you find him guilty?

"A: Yes, I would.

"Q. You know, when you find him guilty, he is either going to get life or death. You are finding him guilty of capital murder. *Would your conscience allow you to find him guilty,* knowing that?

"A: *I don't believe it would, no.*

"Q: What would you do, just refuse to vote?

---

**2.** The trial itself took ten (10) days.

**3.** All emphasis of the record of voir dire is supplied throughout this opinion.

"A: I could give the verdict, but *I would feel guilty* if he did get charged or get the death penalty.

"Q: What would be your action at that time? *Could you put your personal feelings aside* and follow the law as I give it to you?

"A: *Yes, I believe I could.* Knowing it is the law, there is nothing I could do about the law.

"Q: But depending on how strong you are in that regard. See, at the conclusion, if you are selected to serve as a juror, you will be asked to take an oath as a juror that you will a true verdict render according to the law and the evidence submitted to you, so help you God. We don't want you to take that oath unless you can follow it.

"A: I don't believe I could, then.

"Q: All right, then, taking you back to that situation then. Even though you were convinced beyond a reasonable doubt that the defendant was guilty, would your conscience allow you to find him guilty because of the consequences of that?

"A: No, sir, I don't believe so.

"Q: Would you deliberately find him not guilty to avoid that consequence?

"A: No.

"Q: What would you do?

"A: It would be tough.

"Q: I know, but what would you do?

"A: Well, *I guess I would just rather not be picked at all.*"

Davis returned to her original position when questioned by the prosecutor.

"Q: [Prosecutor]: So no matter how bad a defendant might be or how bad an act he had committed or how bad a background he may have had, you still feel like *you could never vote for the death penalty?* Would that be accurate?

"A: *That is correct.*

"Q: So, if you were on a—so it would be impossible for you to ever take the oath to be a juror in a capital murder case and also be true to your conscience?

"A: That is correct.

\* \* \* \* \* \*

"Q: ... *[Y]ou wouldn't be able to say yes to the questions, even though the State proved it,* is that right?

"A: *That's right."*

Appellant's attorney reminded Davis that she had said she could set her feelings aside. He then asked her to explain the change. She responded that "after [the prosecutor's] explanation and the more I thought about it, I would probably be tempted to say 'No', to one of those questions just to keep from him [sic] dying with the death penalty." Appellant's attorney asked no other questions.

Appellant concedes that "it may appear that [his] complaint against the Davis exclusion is invalid under the new ground rules established by the Supreme Court." Nonetheless, he contends we should not defer to the trial court ruling because the judge "was not impartial."

Appellant's claim of lack of impartiality is not supported by the record, thus, it would be appropriate to show deference to the trial court. Even without relying on such deference, though, the record clearly shows that Davis' views would have prevented or substantially impaired the performance of her duties as a juror. Her first response was that she did not believe in the death penalty under any circumstances. After giving equivocating responses about her ability to set aside her personal feelings, Davis returned to her original position and indicated she could never vote for the death penalty. The court did not abuse its discretion in sustaining the State's challenge for cause. Appellant's third point of error is overruled.

## II.

■ In his multifarious point of error number four,[4] appellant contends the trial court erred by denying fourteen of his chal-

---

4. By combining more than one contention in a single point of error, appellant risks rejection on the ground nothing is presented for review. *Russell v. State,* 598 S.W.2d 238, 245 (Tex.Cr. App.1980), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300. It is a close question here, but we will address appellant's point of error.

lenges for cause. The challenges in issue are all raised as a "bias or prejudice against the law" but can be divided into three categories: law of parties (9); consideration of mitigating factors (3); other biases against the law (2). Except for those instances noted below, appellant took the steps necessary to preserve for review the denial of his challenges for cause.

## A. LAW OF PARTIES

 Discussion of the concept of the law of parties [5] began with the second venireman and continued with the majority of the other veniremen called. Although the examination relating to the law of parties varied considerably from one venireman to another, certain commonalities did exist. The general structure of the examination pertaining to the law of parties was as follows:

the trial court read the statute providing for the law of parties and applied it to an hypothetical bank robbery; the prosecutor recited numerous confusing hypothetical fact situations; appellant added his own subtle variations to the basic hypothetical bank robbery; appellant eventually challenged the nine veniremen at issue here based on their responses to his questions about applying the law of parties to the hypothetical fact situations.[6]

Because of the manner in which we resolve this point of error, it is not necessary to quote from the very lengthy voir dire of all nine veniremen. Thus, we quote from venireman Richard Guy's law of parties discussion, the one most representative of the examinations of the other veniremen. *Cf. Meanes v. State,* 668 S.W.2d 366, 369 (Tex.Cr.App.1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 476 (1984) (where a number of challenges were in issue, the most representative voir dire was used). Although the State's discussion of the law of parties is lengthy, reviewing it is helpful because it provides the context for appellant's challenge for cause. (Again, we examine the record of the voir dire as a whole. *McCoy,* supra.)

"(Q). [Prosecutor]: Let me talk to you about the law of parties.

"A. The law of what?

"Q. Parties they call it. I think the judge may have mentioned it. It is when, if two people or more, two people or more, commit a crime, they are all equally guilty of the crime they committed, no matter what part each of them played in committing the crime. Doesn't mean they necessarily get the same punishment.

Did the judge gave [sic] you the example of the getaway driver and somebody robbing a bank?

"A. No, I don't think so.

"Q. Okay. Let's say, for example—

"THE COURT: I knew you were going to repeat it so there was no reason for doing it twice.

---

**5.** V.T.C.A., Penal Code Sec. 7.01, entitled "Parties to Offenses" provides:

"(a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

"(b) Each party to an offense may be charged with commission of the offense.

"(c) ... [E]ach party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice."

V.T.C.A., Penal Code Sec. 7.02, entitled "Criminal Responsibility for Conduct of Another" provides:

"(a) A person is criminally responsible for an offense committed by the conduct of another if:

"(1) ...;

"(2) acting with intent to promote or assist the commission of the offense, he solicits,

encourages, directs, aids or attempts to aid the other person to commit the offense; or

"(3) ....

"(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."

**6.** It is proper to use hypothetical fact situations to *explain* the application of the law. However, it is improper to inquire how a venireman would respond to particular circumstances as presented in an hypothetical question. *See* 23 Tex.Jur.3d *Criminal Law* Sec. 2668 (1982) and the cases cited therein.

"Q. [Prosecutor]: Let's say two people were going to do a robbery of a bank, a getaway driver and a fellow that's going to go in with the gun. And let's assume that they plan to do the robbery, and that occurs.

Let's say the guy with the gun goes in and gets the money and the getaway driver just stays outside, keeps a lookout and then drives the getaway car.

If that happened, they would both be guilty of robbery. The getaway driver also, even though he didn't go inside.

Do you agree or disagree with that law?

"A. I agree with it.

"Q. Now, let's take it a step further. Let me read you this law.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed *in furtherance of the unlawful purpose and* was one that *should have been anticipated* as a result of the carrying out of the conspiracy.

Now, what that means, in a hypothetical situation, is that if that getaway driver and robber, or getaway driver and triggerman, plan the robbery and the triggerman went in to get the money and while he was getting the money a security guard tried to stop him and he shot and killed the security guard, then the triggerman would be guilty of murder as well as robbery. And the getaway driver out in the car would be guilty of robbery, for starters. He also could be guilty of murder, if—and only if—the jury believed beyond a reasonable doubt that he should have anticipated his partner might kill somebody and that killing was in furtherance of the robbery that they had originally planned.

If the jury believed that, then the getaway driver could be guilty of capital murder just like the triggerman was, because, if you kill somebody during a robbery, that's capital murder.

That's a lot of words there. Do you follow what I am saying.

"A. I follow what you are saying, yes.

"Q. *Do you agree are* [sic] *disagree with that law?*

"A. *I agree.* I think, if he was taking a gun in with him, and you use guns to possibly shoot somebody, so—

"Q. There could be lots of variations of that fact situation.

For instance. There could be a situation where a getaway driver and another fellow plan a robbery and the getaway driver thinks the other fellow is going in with an unloaded gun; but unbeknownst to the getaway driver, the other fellow loads his gun and goes on in there; and it turns out he gets in a fight with a security guard and shoots and kills him.

The jury, hearing those facts, might decide that the getaway driver would be guilty of robbery, because they planned a robbery, but they might decide there was no likelihood on the getaway driver's part, they might decide that there is no way the getaway driver should have anticipated that his partner might kill somebody because he didn't know he had a loaded gun.

If that were true, they would find him guilty, maybe, of robbery but not guilty of capital murder. See?

"A. Sounds reasonable.

"Q. Then, to change it a little further. There might be a situation where the getaway driver and the triggerman plan the robbery. Let's say the getaway driver is the bad guy of the two. I mean he is an older fellow, he has been to the penitentiary many times for similar activities, let's say. He has a gun, loaded. He gives it to his partner and says: 'Here, kid, young guy never been in trouble, go inside, take this loaded gun, get the money, if anybody gives you any trouble, shoot and kill them.'

And the young guy goes in there and does that, shoots the security guard and kills him.

If the jury believes those facts to be true, then they might find the triggerman guilty of capital murder. They might also find the getaway driver guilty of capital

murder because, they might decide, he should have anticipated his partner would kill somebody since he told him to if he needed to.

Now, if that happened, *a jury would move then to the second part of the trial* and decide the punishment as to the getaway driver.

\* \* \* \* \* \*

And in doing that, first of all, they would have to decide was the getaway driver's conduct deliberate in setting up the robbery and telling him to go kill, driving the car, whatever. And, then, the bottom part of that question, was there a reasonable expectation on the getaway driver's part that his partner would kill somebody.

In the first part of the trial you decided he should have anticipated he might. Now you are having to decide was there a reasonable expectation he would. Maybe that is a little stronger, but in this situation you might well decide: yeah, he told him to kill somebody, he intended that somebody die, himself, the getaway driver.

\* \* \* \* \* \*

Then you get to the second question. And, let's say, you had already heard the getaway driver had a long past record of violent crimes and he had encouraged this fellow to go shoot somebody. You might well decide the State had proved that he was probably going to do something similar again. So you could say yes.

\* \* \* \* \* \*

"Q. Okay. Of course, there could be a lot of other factors involved that I haven't mentioned, and I am not trying to get you to say what you would do like in this case or a particular case, but just giving you those few facts, you can see how a jury might say yes, and if they had heard other facts that were mitigating, maybe they would say no, just depending on what they had heard.

\* \* \* \* \* \*

"Q. Let me give you another example similar [sic], how facts could change a little bit.

Let's say the getaway driver hasn't been in any trouble before, particularly, and he has a partner that's going to take a gun and go inside and rob the bank. And let's say that their plan is to rob the bank but they haven't mentioned anything about whether to shoot anybody or not, but the getaway driver does know that his partner had a loaded gun and he is going in the bank to rob it. And he goes in there and robs it and shoots and kills a security guard. A jury might decide in that situation that the getaway driver should have anticipated his partner might kill somebody because he knew his partner was going in there with a loaded gun. So they might say guilty in the first part of the trial.

But, then, when they move to the second part of the trial, they have to answer these questions. When they get to that first question, they might decide, the first part of it, the top part of it, they might decide that the getaway driver's conduct was deliberate in planning the robbery, driving the car, et cetera, so it was deliberate. But when they get to the bottom part of the question, the bottom part of the first question, whether there is a reasonable expectation death would result, they might decide that he didn't have a reasonable expectation his partner would kill somebody. He should have anticipated he might, but he didn't have a reasonable expectation that he would. Just a little bit higher standard there of expectation on the part of the getaway driver.

In that situation, it would be possible, then, that jury would find the getaway driver guilty of an intentional capital murder as a party in the first part of the trial, but when they get to the first question in the second part of the trial, they might say no to it because the getaway driver didn't particularly have any intent that anyone get killed. He should have anticipated somebody might, but he didn't really intend that they get killed, and, therefore, they might decide there was no reasonable expectation on his part that anyone would get killed, and they would say no.

"A. I can see.

"Q. So, any of these answers could occur, just depending on what facts you happened to hear.

"A. Yeah, you would have to hear just what the situation was to come to a fair conclusion.

"Q. Any questions so far about anything?

"A. No, not at this time.

"Q. If you have any, don't hesitate to ask, because we won't get a chance to talk to you again. And if you get on the jury, we won't be able to talk to you until after the trial is over with.

"A. No, not at this point. I have no questions in mind."

Thus, the record shows that the State applied the law of parties to an hypothetical set of facts, and the venireman indicated he agreed with the law. The State gave a second, third, and fourth hypothetical fact situation. The State covered several other points of law, and then appellant questioned the venireman as follows:

"Q. [Defense Counsel]: Mr. Graham [the prosecutor] gave you a bunch of hypothetical questions about the bank robbers where one of them was the getaway driver and one of them was a person who went in and killed the security guard. Let me use that same example and ask a few questions.

Let's say that getaway driver is the person who is on trial in the case you are considering as a juror in a hypothetical case. Let's say that he had no intention that anyone would be killed. In fact, he was hoping that nobody would be harmed. And he didn't kill anyone himself or harm anyone himself. It was his associate who went in the bank and killed the security guard and committed the offense and brought money out.

And *we are talking about guilt or innocence, the first stage of the trial.* And the State has the burden of proving that he intentionally caused the death of the security guard, the getaway driver.

Could you find him not guilty even though someone had been killed?

"A. He is obviously guilty of the robbery.

"Q. Oh, yeah, we are not talking about the robbery. We are talking about murder, capital murder.

"A. Yeah, if he had no expectation that anybody was going to get killed or that his partner was going to do anything like that, I think that would have to be taken into consideration. I can see where there would be instances where you wouldn't find him guilty of the murder part of it.

"Q. Okay. Can you give me some of those instances?

"A. Well, like the partner says, you know, 'I have a toy gun here. It looks so much like the real thing they won't know the difference.' And he went in, and it turns out it wasn't a toy, and this guy got killed, I would think then that there were mitigating circumstances, that guy didn't have expectation of a death resulting and—

"Q. You are getting off into this punishment question here now. The State, at the first, at the guilt or innocence stage of the trial, has to prove that the person on trial intentionally caused the death of the deceased. We have a case, that this hypothetical case where the getaway driver knew that his partner had a loaded gun when he went in the bank but he had no intention that he was going to use it or no expectation.

Well, I won't use that word. He had no intention for anyone to be injured or hurt and he was hoping that no one would be injured. That is the situation we are talking about.

"A. Well, okay. I would have to say if the guy knew he had a gun and was going in to rob a place, that it would probably be too much to expect that nothing ever would occur with a loaded gun. My supposition was that he doesn't know he had a gun and didn't intend to kill anybody and, therefore, was not guilty of the murder part of it but was guilty of the robbery.

"Q. Well, you see, my question was—

"A. Yeah, you are getting a little shade of gray there that is hard to define. You are saying that the guy takes a gun in but

the fellow secretly hopes that he won't shoot him. If he only secretly hoped and he didn't say to him before he went in, 'Now don't shoot anybody in there, we want to keep this, you know, clean, and just run out if you can't get it.'

If they agreed to that, then I could see that he was not guilty of the murder part.

"Q. Okay. Well, let's say that that didn't happen. Let's say you went ahead and found him guilty of the offense of capital murder, the getaway driver, because he knew that the other man was going in with a loaded gun. And you told me you would assume from that that he intended whatever happened, even though he was hoping that it didn't happen. Is that what you are telling me?

"A. Yes, I think so.

"Q. All right. Let's say we have reached that point, then, where you have found him guilty because of those facts there. *Then you come to the punishment part of the trial* and that first question there, whether the conduct of the defendant that caused the death of the deceased was committed deliberately. Let's just focus on that first part of the question first.

"A. I don't think the getaway man, you *couldn't answer yes on that question about him because it was not deliberate.*

"Q. Because he is not the one that did the shooting?

"A. Right.

"Q. And how about the second part of that question?

Of course if you found the first part to be no, you would have to answer the whole question no.

"A. Yes, you would have to say no to the whole thing, either one of them.

"Q. So in the hypothetical case that I gave you where *the getaway driver had no intention that anyone would be killed and was really hoping that nobody would be hurt at all,* that his partner would go in there and get the money and come get in the car and they would drive away. You found him guilty of capital murder, you said. You are saying you would answer

that first question no under those circumstances?

"A. He didn't say anything?

"Q. No, nothing was said.

"A. Well, I might still have in my mind that he had told him he didn't want any shooting or anything like that. Under that circumstance, I would say no. If nothing was ever said about the using or not using the gun when he went in there, I would say at this point I would have to say yes because you would have a reasonable expectation that something could occur. That is why you carry a gun.

"Q. Okay. *So, under those circumstances, where the getaway driver had no intention to kill anyone, did not kill anyone, and you found him guilty of capital murder, you would answer yes to that first question?*

"A. *By virtue of the fact that they conspired together and took a gun in there and that is what a gun is for, and if it happened while they were committing the robbery, even though he didn't do it himself, he was as guilty at that stage as the one that did it.*

"Q. We are past guilt. *We are talking about the punishment now.*

"A. Okay.

"Q. If you answer yes to *this first question,* that's one step closer to the death penalty.

"A. *I would have to say yes to that part.*

"[DEFENSE COUNSEL]: *We challenge, Your Honor, under Enmund vs. Florida.*

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: Note our exception. We pass the juror.

"[PROSECUTOR]: We will take Mr. Guy.

"[DEFENSE COUNSEL]: *We will excuse him, Your Honor.*

"THE COURT: All right, sir. Mr. Guy, you may be excused."

It should be noted that at first appellant questioned Guy about applying the law of parties at the guilt-innocence phase. Later, the voir dire focused on answering the

special issues. Appellant challenged venireman Guy as a result of his responses to the hypothetical fact situations. The trial court overruled appellant's challenge, which he had made "under *Enmund v. Florida*."[7]

The record shows that confusion existed in the trial below regarding application of the law of parties to a capital defendant.[8] If appellant's trial is placed in the context of the developing case law, the reason is readily apparent.

In 1979, this Court relied on earlier opinions to hold that the law of parties could be applied not only at the guilt phase of trial but also in answering the special issues under Article 37.071, V.A.C.C.P.[9] *Wilder and Armour v. State*, 583 S.W.2d 349, 356 (Tex.Cr.App.1979), vacated on other grounds, 453 U.S. 902 (1981). However, at the time of appellant's trial in 1983, the viability of that holding was placed in doubt by the Supreme Court decision in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The five member majority seemed to hold that the cruel and unusual clause of the eighth amendment forbids imposition of the death

---

7. Appellant gave *"Enmund"* as his ground for challenging six veniremen: Richard Guy, Darla McMurray, Claudia Coplen, Lawrance Dunn, Shirley McGrath, and Anthony Natale III. He failed to state any ground for his challenges to the remaining three veniremen: Daniel Knerr, Wei Chiu, and Robert Duggan.

8. At an early point during the voir dire, the following exchange occurred.

"THE COURT: We don't want to have to do this four times. If I am wrong, I'm wrong. I don't think that I am wrong.

A part of the hypothetical that [defense counsel] put to the prospective juror was if the driver of a car, not the triggerman, the non triggerman, the driver of the car, had no intent that anyone be killed in the matter. And he went further and he said: but if he had a reasonable expectation that the death of the deceased or another. I don't see anything wrong with that.

"[PROSECUTOR]: Except for the fact, Judge, that Enmund may or may not have injected another necessary element for the Court to charge the jury to charge upon, and that may possibly be whether or not there was any intent on the part of a non triggerman that death result.

"THE COURT: It doesn't make any difference under 7.02(b).

"[PROSECUTOR]: Well, it could be ruled that 7.02(b) applies only to the guilt and that, then, when you get to the punishment part of the trial a jury could be asked to decide not only answer these questions but also answer a question of whether or not there was an intent on the part of the driver.

"THE COURT: Is there a difference between deliberate and intent. Intent is nowhere in there.

"[PROSECUTOR]: No, sir, I know it's not in those questions.

"THE COURT: Number one says the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result. Okay? The conduct of the deceased. Conduct is 7.02(b).

"[DEFENSE COUNSEL]: They are trying to deny us the benefit of Enmund vs. Florida, Your Honor, while working both sides of the street.

"THE COURT: That is why I feel safe in my ruling.

"[DEFENSE COUNSEL]: Right. Under Texas law, I think you are correct; but I think you are wrong under Enmund.

"[PROSECUTOR]: I think the defendant may be trying to rush the court into a hasty decision that may cause this whole case to get reversed, I don't know. The only reason I am trying to take a little time is to make sure I understand it. I probably never will understand it. But I respect the Court's opinion. I am not quarreling with the Court's ruling.

"THE COURT: I know. I want to be safe too.

\* \* \* \* \* \*

"[PROSECUTOR]: ... It may be it would be possible for the 7.02(b) to apply to the guilt or innocence, and then the Court add another special issue in the punishment part of the trial determining whether or not there was any intent involved. I don't know if that would happen or not. But if that happened, it would be because of case law like possibly the Enmund case.

"THE COURT: These are the questions. I don't think I can vary those. Go and you can talk to your lawyer."

9. Article 37.071(b), V.A.C.C.P., provides:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. Thus, a defendant could be *convicted* of a capital offense based on his conduct and that of his co-felons (in Texas through the law of parties), but he could only receive the death penalty based on his own conduct.

Four months after appellant's third trial by jury this Court delivered *Meanes v. State,* 668 S.W.2d 366 (Tex.Cr.App.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 476 (1984), which implicitly held that the law of parties may *not* be applied to the special issues. In *Green v. State,* 682 S.W.2d 271 (Tex.Cr.App.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985), we squarely re-examined the issue of application of the law of parties at the punishment phase of a capital trial. *Green* held that the law of parties may not be applied to the special issues, thus, overruling *Wilder and Armour,* supra. *Green,* supra, at 287. In reaching its holding, the Court relied on a concurring opinion in *Meanes,* supra. In that opinion, Judge Clinton had written that the law of parties as provided by the Penal Code applies only to the guilt-innocence phase of a trial. Thus, the holding in *Green* was based expressly on an interpretation of state statutory law.

Appellant's point of error is that the denial of his challenges for cause violated *Enmund.* His very concise argument is that the nine veniremen were not qualified because they would have applied the law of parties to one or both parts of special issue number one. Because *Enmund* prohibits that, he contends, his challenges were erroneously denied.

Article 35.16, V.A.C.C.P., provides the reasons for challenges for cause. Obviously, appellant's challenges may be viewed as claims of bias or prejudice against the law.[10] Indeed, the State even asserts that appellant "specifically contends on appeal that these prospective jurors were subject to exclusion under Article 35.16(c)(2), V.A.C.C.P., because they harbored a bias against an applicable aspect of the law...." However, neither Article 35.16 nor bias against the law is mentioned anywhere in appellant's brief. Nonetheless, we believe that appellant's contention is, in effect, a claim of bias or prejudice against the principle of law announced in *Enmund.*

To understand *Enmund* we must examine the Supreme Court opinions that have followed it. In *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Supreme Court clarified the *Enmund* rule by addressing the question of when the *Enmund* finding must be made. The majority concluded that *"Enmund* does not impose *any* particular form of procedure upon the States." *Bullock,* 106 S.Ct. at 697. Therefore, the *Enmund* finding could be made by the jury, trial court, appellate court, or even for the first time in a federal habeas corpus proceeding. *Id.* at 697–700. "The Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under *Enmund* for such punishment." *Id.* at 697.[11]

In *Tison v. Arizona,* —— U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Supreme Court recently added a new test for death penalty eligibility in felony murder cases. *Enmund* had addressed two distinct categories of felony murders: (1) "The minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have any culpable mental state [regarding the killing];" (2) "the felony murderer who actually killed, attempted to kill, or intended to kill." *Tison,* supra,

---

**10.** Article 35.16(c)(2) provides:
 "(c) A challenge for cause may be made by the defense for any of the following reasons:
 "2. That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to the phase of the offense for which the defendant is being prosecuted or as

a mitigation thereof or of the punishment therefor."

**11.** We reject the analysis of *Bullock* contained in *Rector v. State,* 738 S.W.2d 235 (Tex.Cr.App. 1986) to the extent that it is inconsistent with this opinion.

107 S.Ct. at 1684. The Supreme Court held in *Enmund* that the death penalty was "disproportional" for the first category but permissible for the second category.

*Tison* involved "the intermediate case of the defendant whose participation [was] major and whose mental state [was] one of reckless indifference to the value of human life." *Id.* at 1685. The Supreme Court held that the eighth amendment proportionality requirement does not bar the death penalty in such circumstances.

We conclude that appellant's reading of *Enmund* is much too broad, therefore, his reliance on that opinion is misplaced. Appellant argues that *Enmund* bars the service of the nine veniremen. For two reasons, however, *Enmund*, per se, is not an appropriate basis for a challenge for cause. First, the underlying premise of appellant's argument is that the *Enmund* finding must be made by the jury. (Only if that be true could that holding bar the veniremen's service.) As previously discussed, though, *Bullock* held that it is not necessary that the jury make the *Enmund* finding; therefore, *Enmund* cannot bar the service of any venireman.

Second, *Enmund/Bullock* and *Tison* have no affect on the Texas capital sentencing scheme. The Supreme Court opinions addressed the issue of whether the eighth amendment prohibits a state from authorizing the death penalty for certain felony murders. Texas has a modified type of felony murder doctrine. *See* V.T.C.A., Penal Code Sec. 19.02(a)(3). However, felony murder in Texas is not a capital offense; it is a felony of the first degree. To be convicted of a capital felony in Texas, a defendant must intentionally or knowingly cause the death of an individual in certain enumerated circumstances. *See* V.T.C.A., Penal Code Sec. 19.03. Of course, application of the law of parties at the guilt phase

means it is possible for a non-triggerman, such as appellant, to be convicted of a capital offense. However, a capital defendant will be assessed the death penalty only if the jury answers the special issues of Art. 37.071(b) in the affirmative. Special issue number one requires the jury to determine "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Because the law of parties may not be applied in answering this issue, an affirmative verdict is possible only when the jury finds that the defendant's *own* conduct satisfies both parts of special issue number one. *Therefore, the first special issue of Art. 37.071(b) includes the Enmund and Tison findings.* The Supreme Court opinions in *Enmund/Bullock* and *Tison* have placed no additional burden on the Texas capital sentencing scheme. *See Bullock*, supra, 106 S.Ct. at 705 n. 3. Accordingly, we reject appellant's contention that overruling his challenges for cause was a violation of *Enmund.*

In his argument on this point of error, appellant cites this Court's opinion in *Green*, supra, where we held that the law of parties may not be applied to the special issues. Because *Green* was decided after appellant's trial, he obviously could not rely on it in making his objections. The question arises, then, whether appellant should receive retroactive benefit of that holding.

■ Even if we assume *Green* applied at the time of his trial, though, appellant has failed to show that the veniremen were biased or prejudiced against the law. No venireman stated that he would apply the law of parties to the special issues or that he disagreed with a law that would prevent him from doing so.[12] Therefore, appellant

---

12. As indicated above, the colloquy between appellant and venireman Guy is representative of that involving the other eight veniremen. Appellant elicited responses to his hypothetical situations and then challenged for cause. Missing from each examination, though, is a statement by the venireman that he would not follow the law as it would be applied to each variation of the bank robbery. That reason is quite simple.

Appellant did not inform eight of the nine veniremen what the law required in each of his subtle variations.

Before a venireman is excused because of bias or prejudice against the law, he should be told what the law is. Several cases illustrate this. In *Evert v. State*, 561 S.W.2d 489 (Tex.Cr.App. 1978), a venireman had been instructed regarding the law of obscenity, including the applica-

is forced to contend that the veniremen's responses could be possible only by an application of the law of parties.

Although defense counsel used several variations of the hypothetical bank robbery, he relied on the same basic hypothetical situation at the time of his challenge. Counsel recited a situation where the hypothetical driver had no intent to kill and "hoped" that no one would be killed during the bank robbery. Having examined each individual voir dire very closely, we conclude that the first special issue could have been answered in the affirmative for the hypothetical fact situation without application of the law of parties. The venireman could have focused on the *driver's* conduct in planning and participating in the offense.

Four of the nine veniremen clearly indicated they based their affirmative responses on the driver's conduct. Venireman Knerr agreed with defense counsel's statement that the basis for his conclusion was the "he [the hypothetical driver] should have had a reasonable expectation that the death of someone would occur." Venireman Guy stated that he would answer in the negative to the "deliberate" part but in the affirmative to the "reasonable expectation" because "[t]hat is why you carry a gun." Venireman McMurray saw deliberate conduct where the driver "was there" and "planned the robbery and they did take a loaded gun." Venireman Duggan stated that the hypothetical defendant's conduct would be deliberate "if he thought about it and it was proven that he had thought process [sic] that would lead to someone being killed."

Three veniremen (Coplen, Dunn, and McGrath) were not asked to explain the basis for their affirmative answers about one or both parts of special issue number one. However, their statements indicate they were focusing on the hypothetical defendant's conduct not that of the triggerman.

No law of parties issue was actually raised with the remaining two. Venireman Chiu was not asked about the first special issue because defense counsel spoke only in terms of the driver's having *anticipated* that something could happen. That the offense "should have been anticipated" is part of V.T.C.A., Penal Code Sec. 7.02(b) which applies to the guilt phase. Finally, defense counsel informed venireman Natale that the law of parties did not apply to the special issues. Natale responded that even without applying the law of parties he would answer in the affirmative on the "deliberate" part.

Natale's examination represents the fallacy of appellant's argument. Appellant contends that any affirmative response to one or both parts of the first special issue *could only* be reached in his hypothetical situation by application of the law of parties. We reject this contention.

■ We hold that appellant has failed to show that any of the veniremen were biased or prejudiced against the principle of law that proscribes application of the law of parties to the special issues. The trial court did not abuse its discretion by denying appellant's challenges to these nine veniremen.

tion of community standards. The venireman indicated that "she would be compelled to find [a film] obscene in accord with her personal standards, regardless of whether such a film offended contemporary community standards." *Id.* at 491. The venireman was subject to challenge for cause. In *Homan v. State,* 662 S.W.2d 372 (Tex.Cr.App.1984), the prosecutor explained the principles of law applicable to a criminal trial, including the presumption of innocence of the defendant. During the voir dire, one venireman indicated that he felt the indicted defendant was "a little bit guilty of something." The venireman should have been excused. *Id.* at

374. *See also, McCoy v. State,* 713 S.W.2d 940 (Tex.Cr.App.1986); *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985); and *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978), *cert. denied,* 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 484 (1979). "Where a conviction depends upon the jury understanding and applying [certain] legal principles, such as the law of parties, these must be explained to the jury and their assurance obtained that they are willing to follow such laws." 7 McCormick and Blackwell, Texas Criminal Forms and Trial Manual § 52.24 (Texas Practice 9th ed. 1985).

## B. CONSIDERATION OF MITIGATING FACTORS

█ In this second part of his multifarious point of error number four, appellant contends the trial court erroneously denied his challenges to venireman Gloria Fishman, Barry Hluchan, and Lawrance Dunn. Appellant claims the veniremen would have refused to consider certain factors in mitigation of punishment. Appellant bases his claim on their responses to an hypothetical bank robbery that included a participant, later a defendant, who had a limited mental capacity (I.Q. of 70 and little education) and was under the control and domination of the triggerman.[13]

Appellant asserts that his challenge for cause directed against venireman Fishman was denied. However, the record shows that appellant made no such challenge for cause. Accordingly, nothing is preserved for review as to Fishman. *Holloway v. State*, 691 S.W.2d 608, 613 (Tex.Cr.App. 1984).

In response to appellant's hypothetical fact situation, venireman Hluchan stated he did not consider the two factors described above to be mitigating. Appellant made a challenge, which was denied by the trial court. Appellant then used a peremptory challenge against Hluchan and retrospectively indicated his challenge was "based upon *Enmund v. Florida* and also on the holding in *Jurek v. Texas*." [14]

Venireman Dunn was asked if he could consider the same two factors. He stated that he could consider them. He was then asked if he *would consider them to be* mitigating factors. Dunn indicated that they would "not necessarily" be mitigating because "if one person could easily fall under the control and domination of another person that would lead to them committing a violent crime, that perhaps the probability of that occurring again could be

high." In an effort to clarify Dunn's position, the trial judge intervened and asked Dunn if he would consider the factors in answering the special issues. Dunn stated again that he would consider them; however, he was not certain that they weighed in favor of the hypothetical defendant. The trial court denied appellant's challenge for cause, which appellant had made without any specified ground. When appellant subsequently requested an additional peremptory challenge, the trial court granted his request.[15]

In his brief on appeal, appellant does not directly cite *Enmund,* supra, or *Jurek,* supra. Instead, he relies on three cases not mentioned at trial: *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). Appellant asserts that Hluchan and Dunn "were not impartial on the penalty issue. They would have turned a deaf ear" to the mitigating factors, thus, they should have been excluded.

*Woodson,* supra, and *Lockett,* supra, held that the eighth amendment requires consideration of the defendant's character or record and the circumstances of the offense before the death penalty may be imposed. Accordingly, the capital defendant must be allowed to introduce any such relevant evidence. In *Eddings,* supra, the Supreme Court struck down the defendant's death sentence because the trial court did not consider the defendant's "troubled childhood" as a mitigating factor. Therefore, all three cases relied upon by appellant concern situations in which the trier of fact in a capital case was *precluded* from considering mitigating evidence. *See Stewart v. State,* 686 S.W.2d 118, 121 (Tex.Cr.

---

13. A trial court does not err in denying a defendant the opportunity to ask an hypothetical question based on the facts peculiar to the case on trial. *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982).

14. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

15. The trial court granted appellant a total of five extra peremptory challenges during the voir dire.

App.1984), *cert. denied*, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985).

Leaving aside the substantial question of whether appellant preserved this issue for review, we hold that the challenges against Hluchan and Dunn were properly denied. Because appellant misconstrues the law, his contention that the veniremen were biased or prejudiced against the law fails.

We recently discussed the significance of *Eddings* and *Lockett* to the voir dire in *Cordova v. State*, 733 S.W.2d 175 (Tex.Cr. App.1987). We indicated that *Eddings* and *Lockett* held that the trier of fact must not be precluded from considering any relevant mitigating evidence in answering the special issues. However, the cases do *not* mandate that the trier of fact must give any specified weight to a particular piece of evidence. *Id.* at 189. "The amount of weight that the fact-finder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion exercised by each juror.'" *Id.* at 189, quoting *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

■ As with the law of parties argument above, appellant's contention is based on a faulty underlying premise. The law only requires that the defendant be permitted to introduce relevant mitigating evidence. Contrary to appellant's contention, the law does not require the jurors to consider his two hypothetical factors as mitigating. Accordingly, the trial court properly denied appellant's challenges against Hluchan and Dunn.

## C. OTHER BIASES

Appellant's two remaining challenges for cause that are in issue were directed against veniremen Tim Cullather and Donald Baulch. Appellant complains that Cullather expressed a faulty understanding of the term "probability" as contained in special issue number two,[16] and that Baulch would have been improperly influenced by appellant's use of a gun during the offense.

Appellant asked venireman Cullather what the term "probability" meant to him. Cullather responded that "it implies that it is a good chance that it would happen." Appellant continued to probe Cullather's understanding of the term, and the venireman gave the following definitions: "[M]y definition would be that there is a strong potential for that act to be repeated. Not that it is likely to happen, but there is a strong potential for it to happen;" "stronger than possibly;" "less than likely ... probability is somewhere between likely and possible;" "somewhere between potential and likely;" "not necessarily 'more likely than not';" "stronger than a potential;" "not that it was equivalent to potential, that it was somewhere between potential and 'more likely than not'"; "I don't believe that 'more likely than not' is to me a criteria;" "a strong likelihood that the act would be repeated;" "a very strong potential of that individual to commit acts of violence." Appellant eventually made a challenge for cause, and when it was denied, he used a peremptory challenge against the venireman. Appellant now contends that Cullather's definition of "probability" reduced the State's burden of proof on the special issue.

■ "Probability" does not have a statutory definition, thus, it is to be taken and understood in its usual acceptation in common language. *See* Article 3.01, V.A.C. C.P. Jurors can be presumed to know and apply such meaning. *Williams v. State*, 674 S.W.2d 315, 322 (Tex.Cr.App.1984). Accordingly, we have held that a trial court may totally foreclose any examination of a venireman's understanding of the term. *Esquivel v. State*, 595 S.W.2d 516, 525 (Tex.Cr.App.1980); *See also Milton v. State*, 599 S.W.2d 824, 826 (Tex.Cr.App. 1980). Nonetheless, appellant was allowed to repeatedly ask Cullather to define the term. The examination of this single point covers ten pages of the record and illustrates the point we made in *Battie v. State*, 551 S.W.2d 401, 405 (Tex.Cr.App.1977):

> mit criminal acts of violence that would constitute a continuing threat to society; ..."

---

**16.** Article 37.071(b)(2) provides: "whether there is a probability that the defendant would com-

"It takes no stretch of the imagination to recognize that voir dire examination could be endless if counsel were allowed to ask each prospective juror questions relative to his understanding of such words and terms as 'reasonable doubt,' 'criminal acts of violence,' and 'sound memory and discretion' which have been found to be 'words simple in themselves' that 'jurors are supposed to know such common meaning.'"

Dictionary definitions of "probability" include: "likelihood; appearance of reality or truth; reasonable ground of presumption; verisimilitude; consonance to reason.... A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it." *Black's Law Dictionary* 1081 (5th ed. 1979); "Something that is probable," with "probable" meaning "supported by evidence strong enough to establish presumption but not proof; likely to be or become true or real." *Webster's New Collegiate Dictionary* (1980).

 Considering the responses of the venireman as a whole and showing deference to the trial court, we reject appellant's contention that Cullather exhibited a faulty understanding of the term "probability". Therefore, we hold that the trial court did not abuse its discretion in denying appellant's challenge for cause to venireman Cullather.

 Donald Baulch is the last venireman in issue. When the State was explaining "deliberately" as used in special issue number one, Baulch interjected the following comment:

"A. Yes. Let me say something here. And I feel very strongly about this type of thing. Whenever somebody picks up a gun, because I have hunted all my life. I lost my right eye. And I feel extremely strong, that when someone picks up a gun to go hunting or to go rob somebody, that if they didn't have intent to harm one way or the other, they wouldn't pick up the gun. Now, be that for self-protection or whatever. But I am just saying I feel very strongly about that. So when somebody points it at someone, that is one thing. Whenever they pull the trigger, it's something else. So I start breaking it down at this point."

Later, appellant questioned Baulch about his statement:

[DEFENSE COUNSEL]:

"Q. Mr. Baulch, I am pretty comfortable with most of your answers, but I am concerned about your feeling about the guns. Would you tell me again how you feel about that?

"A. Sure. I feel very strongly that when someone picks up a gun, he is going to use it for a purpose, whether it's target shooting, hunting, shooting at cans, or going to rob someone or in other words, he has a reason for using it. It's like getting in a car. You have a reason for getting in a car, not just to sit there but to do something with it and go somewhere.... So I feel like when you do these things, you are doing it with some conscious effort. It's like going hunting with somebody. When you go hunting with them, you might not have a gun. There is only one gun, he's carrying a gun, but you know you are going to go out and you are going to hunt for something.

* * * * * *

"Q. Well, do you think that basic feeling that you have about guns might influence your consideration of the evidence in the case where guns are involved? You are the only one that can answer it.

"A. I have to answer it I would have to lean—it does have some bearing on my thinking where a gun is involved.

* * * * * *

"Q. But if you heard evidence in a case, and here, now, we are considering evidence in a hypothetical case, that a gun had been used, you would have these basic feelings about the person who uses a gun, is that correct?

"A. Oh, yeah.

"Q. Or carries a gun?

"A. That is true.

"Q. So it would influence your decision?

"A. It would have to in some degree, definitely.

"[DEFENSE COUNSEL]: We challenge, Your Honor.

"[PROSECUTOR]: Judge, that's only common sense. That's part of the factors to be considered.

"THE COURT: Overruled."

\* \* \* \* \* \*

[DEFENSE COUNSEL]:

"Q. Right. What you are really telling me is that you really don't feel you could be a completely fair and impartial juror in such a case? Isn't that basically what you are saying?

"A. Well, I haven't heard any circumstances, but I am saying that if there is only one gun, and I am saying in a group, whether it's one or twenty people, I feel like at that point, if they go along with the fellow that has the gun, then they could get into a problem. I mean we'll say like a robbery or something like that. And then I would think, if course, if that is the law, I am just saying if they all say we agree we are going to go rob a bank or, say, a 7–11 store, and only one man has the gun, he goes in, all the rest are staying outside waiting for the guy to come out with the money, and he purposely or accidentally shoots the fellow, the teller or the cashier, I think we have a problem.

"Q. We have a problem in what way?

"A. In that they are all, you know, knowingly went along with the fellow, knowing that he had the gun, he was going inside and rob the store. There may or may not be some shooting.

\* \* \* \* \* \*

"Q. So in a case where, say, the getaway driver did not kill anyone or have any intent to kill anyone, you would still find that he had an intent to kill based on your feeling about guns?

"A. I think that he should have known the consequences of the man going in there with a gun to rob a store.

"Q. So that would be your feeling based on how you feel about guns, that

would influence you in arriving at that decision, isn't that correct?

"A. Well, he knew that the man went in the store to rob it with a gun and, like I say, I would say yes, that he would be just as much a party of it as the fellow that actually went it.

"Q. And your feeling would cause you to believe that he had an intent to kill whether he went in there with the man who had the gun?

"A. No, I don't think he would have the intent to kill. I am just saying that the man that went in the store had a gun. Now whether he killed somebody or not, only he knows whether he is intending to do it.

"Q. Right. Well, now, you told me earlier if two or three people, one of them had a gun and they—

"A. They went in to rob a store. I have no idea what the other fellow wanted to do, but I know that had they not known the consequences, they shouldn't have been there.

"Q. And based—

"A. Based right there, I am saying right there.

"Q. Based on the use of the gun in those circumstances, you would conclude that they all had an intent to kill?

"A. That's right.

"[DEFENSE COUNSEL]: We challenge, Your Honor."

The court denied the challenge and then took the noon recess. Following that recess, appellant asked the trial court if the record could reflect that "our challenge to Mr. Baulch was based upon *Enmund v. Florida.*"

Appellant contends that Baulch's feelings would have influenced his consideration of the evidence in a case where guns were involved. He apparently asserts that Baulch was biased or prejudiced against the principle contained in *Enmund,* supra.

We held above that *Enmund,* per se, is not a basis for a challenge for cause. In any event, Baulch's comments are quite consistent with *Enmund,* which held that a non-triggerman may be assessed the death penalty so long as he "possessed a suffi-

ciently culpable mental state." *McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987). More importantly, Baulch's main point was that the non-triggerman should be held accountable based on *his conduct* in joining the known plans of the triggerman. Thus, Baulch was stating that a non-triggerman defendant acted "deliberately" in such an hypothetical situation. We hold that the trial court did not abuse its discretion by denying appellant's challenge for cause to venireman Baulch.

Having examined all fourteen challenges for cause and finding no error, we overrule appellant's fourth point of error.

### III.

In his fifth point of error, appellant contends that "unauthorized procedures used in the selection of jurors," including "active collaboration" between the trial court and prosecutor, violated several of his constitutional and statutory rights.[17] Appellant's primary complaint is that the trial court allowed discussion of whether the appropriate ruling had been made on a challenge for cause.

Appellant argues that the close cooperation between the trial judge and prosecutor is illustrated by the voir dire of John F. Kose. Appellant questioned venireman Kose regarding his views on the death penalty. He then made a challenge for cause without stating any ground or authority. The trial court denied his challenge to which appellant "excepted" and, for the first time, cited "the two Cuevas cases previously tried and the identical questions."

Appellant's tardy reference to the previous *Cuevas* opinions apparently caused the prosecutor to be concerned because he asked:

"[PROSECUTOR]: Judge, could we, before a ruling is made, could we discuss this? It is similar to a situation we had earlier. I don't think it is on all fours,

but I think it is worth considering before a ruling is made.

"THE COURT: At this time it is denied.

"[DEFENSE COUNSEL]: We have nothing further from this juror.

\* \* \* \* \* \*

"[PROSECUTOR]: Judge, in the interest of caution, we would agree with the defense, if they wish to excuse this juror for cause.

"[DEFENSE COUNSEL]: We passed the juror, Your Honor. It's not at that point now. The State has to either take this juror or excuse him.

"[PROSECUTOR]: I don't think that is the situation.

"THE COURT: I don't either, because otherwise I am going to take him back. He was equivocal in some phases, but he answered all of my questions to my satisfaction, and now he has answered Mr. Graham's to my satisfaction, that he would not automatically, just because he had found a defendant guilty in a case, automatically answer these questions yes.

"[DEFENSE COUNSEL]: It is up to the State whether they want him or not.

"[PROSECUTOR]: As long as the record is clear, the defense was given the opportunity to request for cause strike, I don't really think that the juror needs to be excused for cause, Your Honor.

"THE COURT: If there is no agreement to excuse for cause, I'll excuse him for cause."

Immediately following the noon recess, but before another venireman was called, the prosecutor requested that he be allowed to use a peremptory strike on [Kose] "in the interest of justice." Appellant made no objection to this procedure.

The trial court did not err in allowing the State to substitute one of its peremptory challenges for a previous challenge for cause. *Franklin v. State,* 693 S.W.2d 420, 427 (Tex.Cr.App.1985).[18] Therefore, the

---

**17.** Appellant claims violations of: U.S. Const. amendments VI, VIII, and XIV; Tex. Const. art.

I, secs. 10, 15 and art. II, sec. 1; articles 35.13, 35.15, 35.17, 35.21, V.A.C.C.P.

**18.** In *Franklin,* supra, the State substituted a

Kose voir dire fails to support appellant's claim of "collaboration".

Appellant further contends that "on every occasion where the prosecutor was dissatisfied with the judge's denial of a defense challenge for cause ... the court acceded to the prosecutor's demands and sought to rehabilitate the passed venireman." However, appellant fails to cite the location in the record of these occurrences. Accordingly, he has presented nothing for review other than the examination of Kose, discussed above. *Thomas v. State*, 701 S.W.2d 653, 662 (Tex.Cr.App.1985); *Green v. State*, 682 S.W.2d 271, 292 (Tex.Cr.App. 1984); *Cook v. State*, 611 S.W.2d 83, 87 (Tex.Cr.App.1981); Art. 40.09(9), V.A.C. C.P., now Tex.R.App.Pro. Rules 210 and 74(d). Appellant's fifth point of error is overruled.

### IV.

In his first and second points of error, appellant raises a question concerning the court's charge at the punishment phase of the trial. The court denied appellant's request that the charge "instruct the jury that the Texas law of parties does not apply to its determination of special issue number one on punishment." Appellant's first point of error relies on *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). His second point of error is based on Supreme Court decisions under the United States Constitution. We will discuss the points of error in inverse order.

### A. UNITED STATES CONSTITUTION

■ In his second point of error, appellant contends the trial court's refusal to give the requested instruction violated the United States Constitution. Specifically,

appellant cites the sixth[19], eighth, and fourteenth amendments and the Supreme Court rulings in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). Appellant's argument is that the failure of the Texas capital sentencing scheme to require the instruction in the court's charge creates a facial constitutional defect. He then relies on *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), to argue that a federal harmless error analysis cannot be used and, thus, his death sentence should be vacated.

We do not reach the issue of federal harmless error analysis, because the Texas statute does not suffer the claimed constitutional defect. For the reasons given below, we hold that the instruction requested by appellant is not required by the United States Constitution.

Although we have already discussed the three cases cited by appellant, we reiterate their holdings. In *Woodson*, supra, North Carolina's death penalty statute was struck down because the mandatory scheme precluded the sentencer from considering relevant facets of the defendant's character and record or the circumstances of the offense. On the same day, however, four other capital cases were decided, including *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Texas statute was not found to suffer the same defect because the second special issue on punishment provides the opportunity for the sentencer to consider "whatever mitigating circumstances" the defendant might be able to show. *Jurek*, supra, at 272–273, 96 S.Ct. at 2955. Accordingly, we do not believe

---

peremptory challenge for a challenge for cause after deciding that its challenge had been erroneously granted. We held that where the change occurred after a ten minute recess but before another venireman was examined, the trial court did not err by permitting the change. The same procedure was used here. In any event, appellant failed to preserve this situation for review because he did not object to the State's substitution of the peremptory challenge.

*Esquivel v. State*, 595 S.W.2d 516, 527 (Tex.Cr. App.1980).

**19.** None of the sixth amendment provisions are applicable. Only the eighth amendment cruel and unusual clause, as construed by the Supreme Court and applied to the states through the fourteenth amendment, is implicated here.

*Woodson* provides any support for appellant's claim of a facial constitutional defect.

*Lockett,* supra, does not provide any support either. In *Lockett,* the Supreme Court addressed the question of *which* facets of an offender or his offense are relevant. The Court concluded that the sentencer must not be precluded from considering, as a mitigating factor, *any* aspect of a defendant's character or record and *any* of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.,* 438 U.S. at 604, 98 S.Ct. at 2964–2965. Special issue number two satisfies this requirement as well. *Jurek,* supra.

In *Enmund,* supra, the Court said that the focus had to be on the *defendant's* culpability, not on those who committed the robbery and shot the victims. The Texas capital sentencing scheme provides that on conclusion of the presentation of the evidence at the punishment proceeding, the court shall submit the special issues to the jury. Art. 37.071(b), V.A.C.C.P. "[S]pecial issue number one clearly focuses the jury's attention on the individual defendant by asking if the 'conduct of the defendant' was committed deliberately and with the reasonable expectation that death would result." *Meanes v. State,* 668 S.W.2d 366, 375 (Tex.Cr.App.1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 476 (1984). Moreover, as we said above, this special issue *includes* the required *Enmund* finding.

Therefore, although it lacks the instruction requested by appellant, the statute does not suffer a facial constitutional defect. *See also Skillern v. Estelle,* 720 F.2d 839, 848 (5th Cir.1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984) (While it might be preferable to charge that the Texas law of parties does not apply to the special issues, the ambiguity, if any, does not result in a level of uncertainty or unreliability in the fact-finding process such that the Texas capital sentencing scheme is defective.) Appellant's second point of error is overruled.

### B. STATE LAW

At the time of appellant's trial, no existing authority required submission of the charge he requested. In *Green,* supra, which was delivered about one year after appellant's trial, the following dictum was included and appellant now relies on it in his argument:

> "Upon request by a capital murder defendant or the State, the jury is to be instructed at the punishment phase that only the conduct of the defendant can be considered at the punishment phase, and that the instructions pertaining to the law of parties given at the guilt stage cannot be considered. Appellant did not request any such charge in this case."

*Id.* at 287, n. 4; *See also, Marquez v. State,* 725 S.W.2d 217, 225 (Tex.Cr.App.1987).

The substance of footnote four was dictum, because the defendant in *Green* made no such request. If footnote four were on the level of a judicial *holding,* the question would be whether it should be retroactively applied. However, because that is not the case, the question becomes whether we should affirm footnote four as an accurate statement of the law and, if so, whether the resulting error is reversible. We need not address the issue of adopting the instruction requirement because even if we assume error, it was harmless error.

In the instant case, appellant preserved error, if any, by his timely requested jury instruction. Therefore, any harm to appellant resulting from the trial court's refusal of the requested instruction will require reversal of his conviction. *Arline v. State* (Tex.Cr.App.1986) (No. 170–86 delivered March 11, 1987, slip op. at 6); *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985). The degree of actual harm must be assayed in light of the entire jury charge, the state of the evidence including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed in the record. *Almanza,* supra, at 171.

Having examined the court's charges at both the guilt and punishment proceedings, we conclude the jury could not have been

misled into believing that the law of parties applied to the special issues. In the court's charge at the punishment proceeding, the trial court submitted the special issues to the jury. As we said in *Meanes,* supra, "special issue number one clearly focuses the jury's attention on the individual defendant ..." *Id.* at 375. That occurred here as the special issue was directed solely at the "conduct of the defendant, Ignacio Cuevas." No mention was made of his co-conspirators. In marked contrast stands the charge at the guilt phase, where the law of parties was explained and applied to the facts of the case. In pertinent part, the court's charge reads:

> "Now, therefore, if you find from the evidence beyond a reasonable doubt that ... *the defendant, Ignacio Cuevas,* ... was knowingly or intentionally attempting to carry out a *conspiracy with Fred Gomez Carrasco and Rudolfo Dominguez* to commit the offense of escape from a penal institution ... and if you further find that Rudolfo *Dominguez caused the death of Julia Standley* if he did while attempting to escape from said penal institution and that the defendant, Ignacio Cuevas, pursuant to said conspiracy, if any, *with the intent to promote, assist, or aid Rudolfo Dominguez and Fred Gomez Carrasco* in the commission or attempted commission of the said escape, then and there, at the time of the shooting of Julia Standley, if any, *was acting with and aiding Rudolfo Dominguez and Fred Gomez Carrasco* in the execution or attempted execution of said escape, and that the *shooting of Julia Standley,* if any, occurred during the execution of the conspiracy, if any, and *in furtherance of the unlawful purpose,* if any, *of Ignacio Cuevas, Rudolfo Dominguez and Fred Gomez Carrasco* to commit the escape, and that the shooting of Julia Standley if any was an offense that should have been anticipated as a result of the carrying out of the conspiracy, if any, then you will find the defendant, Ignacio Cuevas, guilty of Cap-

ital Murder as charged in the indictment." (emphasis added).

Because the charge at the guilt phase so clearly related to the issue of guilt-innocence of the offense, the instructions on the law of parties could not have carried over to the punishment phase. In accord with this is the principle that instructions given during the guilt phase do not "carry over" to punishment. *Brown v. State,* 617 S.W.2d 234, 238 (Tex.Cr.App.1981).

The argument of counsel also works to dictate a finding of no harm.[20] Defense counsel expressly told the jury:

> "Now you notice in this charge you are not—the law of parties has no application whatsoever. You have to judge the culpability of [appellant] at this point in the trial on his acts, on his acts alone, not on the acts of his co-conspirators. The law of parties has nothing to do with the punishment. Mr. Graham went into great detail in the voir dire on that. Each member of the conspiracy, if there was one, is to be judged on his acts in the commission of the felony, of any of the criminal acts. His actions alone."

For its part, the State did not contradict this. In his closing argument the prosecutor referred the jurors to the following as evidence of deliberate conduct and reasonable expectation of death:

> \* Appellant participated in devising the plan to escape, including the plan to take hostages;
>
> \* During the eleven-day ordeal, appellant placed his revolver to the heads of several hostages and threatened to kill them;
>
> \* Appellant agreed to shoot his female hostage if an effort was made to stop the escape attempt;
>
> \* Appellant participated in the actual escape attempt by wearing a heavy metal helmet, carrying a loaded revolver, and concealing himself inside the shield of books and bodies;

---

**20.** As we acknowledged in *Arline,* supra, "jury argument is not a substitute for a proper jury charge. However, it can be relevant in determining whether ..." a defendant was harmed. *Id.* at 9 (slip opinion).

\* Appellant fired his gun four times during the shootout, possibly wounding Father O'Brien.

At no time did the State argue that the law of parties applied to special issue number one. Thus, the State focused exclusively on appellant's own conduct in arguing for an affirmative verdict to the special issue.

In light of the wording of special issue number one, the application of the law of parties to the facts of the case at the guilt phase, and the argument of counsel for appellant and the State regarding the law and the evidence, no actual harm accrued to appellant. Accordingly, we hold that error, if any, in refusing the requested instruction was harmless error. Appellant's point of error number one is overruled.

Having considered appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

CLINTON, J., concurs in the result.

TEAGUE, J., not participating.