SWIFT V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-236-CR

RICHARD DENNIS SWIFT APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Richard Dennis Swift appeals his conviction and two-year sentence and a $5,000 fine for cruelty to animals.  In two issues, appellant contends that the evidence is factually insufficient to support the verdict and that the jury charge was fundamentally defective for improperly defining a word which lowered the State’s burden of proof.  We affirm.

II.  Background Facts

On July 14, 2004, appellant was at Rodney Dean Swift’s, his brother’s, house with his nephew.  Rodney owned a one-year-old black labrador retriever named Bull.  Rodney testified that Bull remained outside in the backyard when he was not at home.  At approximately 2:00 p.m., Stephen Gillis and Glenda Sanchez, Rodney’s neighbors, saw Bull running across neighbors’ yards with duct tape around his snout and head.  When Bull got to Glenda’s yard, he collapsed, and Glenda, her husband, and Gillis sprayed Bull off with a hose and attempted to remove the duct tape from his face.  Gillis testified that Bull was breathing heavily and that he was not responding to their care. 

Soon after Bull collapsed, Shelly Bailey, an SPCA Texas Humane Services officer, arrived and loaded Bull into the back of her truck.  As she was driving down the street en route to the animal hospital, Bailey noticed the address that was listed on Bull’s dog tags.  Bailey knocked on the door and after no one responded, she began walking back to her truck when appellant came to the door.  Bailey asked appellant if he had duct taped Bull’s snout, and appellant said that he did because he was trying to “teach him a lesson” because Bull was barking.  After learning that Bull had escaped from Rodney’s backyard and that he was injured, appellant unloaded Bull from Bailey’s truck and loaded him into his van so that he could take him to the animal hospital.  Dr. Greg Darbro, a veterinarian at North Colony Animal Clinic, determined that Bull was suffering from a heat stroke and performed several treatments in an attempt to cool down his body temperature.  However, after Bull did not show any signs of improvement, he was transferred to Alma and Spring Creek Emergency Clinic for overnight observations.  After talking with Dr. Michelle Hazlewood, a veterinarian at Alma and Spring Creek Emergency Clinic, Rodney decided to euthanize Bull so that he would not suffer anymore.

On May 18, 2005, a jury found appellant guilty of the offense of cruelty to animals and assessed his punishment at two years in a state jail facility and a $5,000 fine. 

III.  Factual Sufficiency

In his first issue, appellant complains that the evidence is factually insufficient to show that he intentionally or knowingly muzzled Bull as a form of torture.

A.  Standard of Review

I
n reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact-finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact-finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Applicable Law

Section 42.09 of the penal code discusses the offense of cruelty to animals.  
Tex. Penal Code Ann.
 § 42.09 (Vernon Supp. 2005).  Section 42.09(a)(1) provides that “[a] person commits an offense if the person intentionally or knowingly tortures an animal.”  
Id. 
42.09(a)(1).  

C.  Applicable Facts

At trial, Gillis testified that on July 14, 2004 at approximately 2:00 p.m., he was getting out of his truck when he saw Bull running across the yards across the street from his house.  Gillis stated that Bull had foam around his mouth, and the tip of his tongue was sticking through his teeth.  He said that Bull had duct tape around his mouth and neck and appeared dazed.  After Bull took off running, Gillis went inside his house and called the police.  Gillis then went back outside and noticed that Glenda, a neighbor on the opposite side of the street, had caught Bull, and Gillis went down to her house to help.  When he arrived, Glenda and her husband were attempting to cut the tape off Bull’s nose and hosing him down with a water hose.  He stated that the duct tape was on “fairly tight.”  Gillis testified that Bull was panting, his eyes were glazed, and he was lying on the sidewalk.

Gillis stated that when Bailey arrived, he helped put Bull in the back of her truck.  After he arrived home, he looked out of his front window to see what Bailey was doing because she had stopped at Rodney’s house.  Gillis stated that Bailey knocked on Rodney’s door and when no one answered, she began walking back towards her truck when appellant came out of the house.  Although Gillis could not hear the conversation between Bailey and appellant, he saw that appellant was getting upset, so he called the police again because he was afraid that Bailey might have a problem with appellant.  However, Gillis testified that appellant went back inside and got in his van, and Bailey followed him in her truck.

Glenda testified that she was getting groceries out of her car when she saw Bull running through her front yard with foam at his mouth.  She noticed that Bull had duct tape around his neck and mouth and that his mouth was taped shut.  Glenda testified that Bull collapsed on her front yard and that her husband grabbed the dog so that he could help it.  She noticed that Bull was having a hard time breathing.  After Bull collapsed, Glenda and her husband began hosing him down with a water hose and trying to take the duct tape off his face.
(footnote: 2)  However, Bull did not respond.  Glenda testified that Bull’s hair was coming off with the duct tape, he had blisters on his mouth, and the vessels in his ears were showing.

Additionally, after Bailey arrived and put Bull in her truck, Glenda saw Bailey stop in front of the house that was listed on Bull’s dog tags.  After appellant answered the door, Glenda testified that she could hear Bailey and appellant arguing.  After appellant put Bull in his van and drove off, Glenda followed him to the animal hospital because she was concerned about where he was taking the dog.

Bailey stated that she was dispatched at approximately 2:30 p.m. after the animal control received a call that a black labrador retriever had duct tape around his mouth.  She testified that she arrived approximately two to three minutes after receiving the call and saw the dog being hosed down.  She said that Bull was not responding to anything, he was almost unconscious, he was breathing heavily, he had blood blisters on his mouth, and the blood vessels in his ears had burst.
(footnote: 3)  After observing Bull, Glenda’s husband and Gillis helped her load Bull into the back of her truck.  After noticing that Bull had dog tags on, she attempted to call the phone number on the tags; nobody answered, so she left a message.  However, when she was driving down the street, Bailey stated that she passed the house that was listed on Bull’s tags, and so she reversed, got out, and knocked on the door.  She said that after she began walking away, appellant answered the door.  Bailey asked him if he had a black labrador retriever named Bull, and he said yes.  Bailey then asked appellant if he was responsible for putting duct tape around his mouth, and appellant said that he was.  Appellant told Bailey that he put the duct tape around Bull’s nose because Bull was barking and because he was going to “teach him a lesson.”

After telling appellant what had happened, appellant wanted to see Bull, so they walked down to Bailey’s truck.  Bailey testified that there was still duct tape on Bull’s nose and that appellant pulled the duct tape off and took it inside.  After appellant came back outside, he said that he needed to get his van, and appellant and Bailey unloaded Bull from Bailey’s truck and put him in appellant’s van.  Bailey followed appellant to North Colony Animal Clinic to make sure that he was going to take Bull to the veterinarian.  Bailey stated that after she left North Colony Animal Clinic, she went to the police department to make a statement.
(footnote: 4)
 Bailey testified that a muzzle is not a necessary tool to train a dog.  She further stated that a dog should not wear a muzzle when it is unattended. Additionally, Bailey testified that she did not think there was any reason to put duct tape around a dog’s nose.

Dr. Darbro testified that he began caring for Bull when he was six weeks’ old.  He stated that at approximately 2:40 p.m., appellant and Bailey brought Bull into the clinic and that Bull was lying on his side, breathing through his mouth, panting very heavily, and appearing somewhat incoherent.  Bull did not respond to his name.  He said that Bull had a temperature of over 107 degrees and that a dog’s normal range of temperature is between 99 degrees and 102 degrees.
(footnote: 5)  After determining that Bull was suffering from a heat stroke, Dr. Darbro gave Bull a cooling bath, put rubbing alcohol on the inside of his ears and on his foot pads to help radiate the heat away from his body, and started him on an IV with chilled fluids.  After approximately twenty minutes of therapy, Bull’s temperature dropped to 101 degrees.  However, Dr. Darbro testified that Bull was not mentally responding very well and that he was not able to sit up.  He stated that Bull’s symptoms indicated that he had suffered some brain damage.  Dr. Darbro then administered some medicine in Bull’s IV to help shrink the size of his brain to help alleviate the swelling.  He further stated that after Bull suffered a seizure, he determined that he should be transferred to Alma and Spring Creek Emergency Clinic for overnight observation.

Dr. Hazlewood testified that she was Bull’s treating veterinarian from approximately 7:20 p.m. to 7:50 p.m. on July 14.  She stated that when Bull arrived, he was non responsive, had bloody diarrhea, had tape marks on his nose, was not able to lift his head, and had red blotches on his ears and mucus membrane.  She stated that he had a very poor prognosis.  After talking with Bull’s owners, they decided that the best option would be to euthanize him so he would not suffer anymore.

Rodney testified that Bull would scratch on the door and bark excessively when he was left alone.  He stated that he used a bark collar on Bull when he was going to be left alone or when no one was going to be at home so that he would not bark.  Rodney stated that it was an acceptable practice to train a hunting dog with a muzzle so that the dog would not bark at the birds.

Rodney testified that on July 14, when he arrived at North Colony Animal Clinic, appellant was sitting on the bench crying and kept saying that he was sorry.  Rodney stated that appellant had used muzzles on dogs before and that appellant’s dog, Domino, had been trained with a duct tape muzzle.  However, Domino’s muzzle had foam on the inside of the muzzle to prevent the duct tape from sticking on the dog’s hair.  Rodney said that he did not want appellant to get in trouble.

Stella Moore, a dog trainer, testified that a muzzle was not designed to stop dogs from barking and that it should never be used on an unattended dog.  She said that putting duct tape around a dog’s nose is cruel because it impedes their ability to breathe.

Appellant contends that the evidence is factually insufficient to establish that he intentionally or knowingly tortured a dog by placing duct tape around its snout and mouth.  Appellant states that “the only logical conclusion was that appellant taped the dog’s snout to keep him from barking incessantly and disturbing the neighbors.”  However, appellant admitted that he had applied the duct tape to Bull and had told Bailey that he had applied the duct tape to “teach [Bull] a lesson.”  Additionally, appellant had a duct tape muzzle for Domino, but he applied it loosely and had foam on the back so that it did not stick to Domino’s hair.  However, the duct tape muzzle that he put on Bull was “very tight” and did not have the foam protection on the inside to prevent Bull’s hair from sticking to the duct tape.  In fact, Bull’s hair came out when the duct tape was removed from his nose.  The jury could have inferred from the facts that appellant intended to torture Bull because he applied the duct tape tightly on his snout and neck and did not use the foam that he had previously used on Domino’s muzzle.  
See Manrique v. State
, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).  Additionally, appellant duct taped Bull’s mouth shut on a hot summer day, and Bull could not even open his mouth to pant or drink water.  When viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary proof that it would not support the finding of guilt beyond a reasonable doubt.  We overrule appellant’s first issue. 

IV.  Jury Charge

In his second issue, appellant asserts that the jury charge was fundamentally defective because the term “torture” was defined improperly, which lowered the State’s burden of proof.

A.  Applicable Facts

“Torture” was defined in the jury charge as, “every act or omission whereby unnecessary or unjustifiable pain or suffering is caused to an animal.” 

B.  Analysis

Appellant argues that the State’s burden of proof was lowered because the term “torture” was improperly defined in the jury charge.
(footnote: 6)  Appellant correctly points out that the penal code does not define “torture within section 42.09.”
(footnote: 7)  If a phrase, term, or word is statutorily defined, the trial court must submit the statutory definition to the jury.  
Moore v. State
, 82 S.W.3d 399, 408 (Tex. App.སྭAustin 2002, pet. ref’d); 
see also Alexander v. State
, 906 S.W.2d 107, 111 (Tex. App.སྭDallas 1995, no pet.).  Words that are not statutorily defined are to be given their common, ordinary, or usual meaning, and no specific instruction is required for these terms.  
Moore
, 82 S.W.3d at 408; 
see also Medford v. State, 
13 S.W.3d 769, 771-72 (Tex. Crim. App. 2000); 
Martinez v. State, 
924 S.W.2d 693, 698 (Tex. Crim. App. 1996); 
Roise v. State
, 7 S.W.3d 225, 242 (Tex. App.སྭAustin 1999, pet. ref’d), 
cert. denied
, 531 U.S. 895 (2000).  Additionally, jurors are presumed to know and apply the common and ordinary meaning of words.  
Moore
, 82 S.W.3d at 408; 
see also Cuevas v. State
, 742 S.W.2d 331, 346 (Tex. Crim. App. 1987), cert. denied, 485 U.S. 1015 (1988).  

When the law regarding cruelty to animals was codified in 1974 the Legislature omitted the definition of torture.  
See 
Act of May 23, 1973, 63rd  Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 885;
 see also State v. Kingsbury
, 129 S.W.3d 202, 206 (Tex. App.སྭCorpus Christi 2004, no pet.).  The term remains undefined in the present statute.  
See 
Tex. Penal Code Ann.
 § 42.09; 
Kingsbury
, 129 S.W.3d at 206.  However, an earlier version of the animal cruelty statute defined the term torture “to include every act or omission whereby unnecessary or unjustifiable pain or suffering is caused to an animal.”  
Barnett v. State
, 117 Tex. Crim. 358, 35 S.W.2d 441, 443 (Tex. Crim. App. 1931).  Several courts of appeals, albeit in unpublished opinions, have followed the earlier definition of torture.  
See Hansen v. State
, No. 05-03-00649-CR, 2004 WL 1353783, at *3 (Tex. App.སྭDallas June 17, 2004, no pet.) (not designated for publication); 
In re J.A.M.
, No. 03-02-00610-CV, 2003 WL 22303115, at *5 (Tex. App.སྭAustin Oct. 9, 2003, no pet.) (not designated for publication).  Justice is better served by defining words and phrases that have a known and established legal meaning or that have acquired a peculiar and appropriate meaning in the law, as where the words have a well-known common law meaning.  
Breckenridge v. State
, 40 S.W.3d 118, 123 (Tex. App.སྭSan Antonio 2000, pet. ref’d); 
see also Medford
, 13 S.W.3d at 771-72.  Because several courts of appeals have extended the earlier definition of torture to the present statute, we determine that the definition is an established legal meaning.  
Cf. Breckenridge
, 40 S.W.3d at 123.  We hold that the term “torture” was not improperly defined in the jury charge because appellant did not object at trial and no egregious harm occurred.  Therefore, we overrule appellant’s second issue.

V.  Conclusion

Having overruled appellant’s two issues, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: April 20, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Glenda testified that she had to use scissors to remove the duct tape because she could not get it off with her hands.

3:
Bailey testified that a symptom of a heat stroke in dogs is that the blood vessels in their ears explode.

4:
Michael Fox, a sergeant with The Colony Police Department, testified that Bailey came into the police station and wanted to file a cruelty to animals police report. 

5:
Dr. Darbro testified that the thermometers only went up to 107 degrees and that Bull’s temperature was above that, so he could not testify what Bull’s exact temperature was.

6:
Appellant contends that the normal meaning of the term torture is found in the dictionary.  He quotes the dictionary as defining torture as “anguish of body or mind,” “something that causes agony or pain,” and “the infliction of intense pain to punish, coerce, or afford sadistic pleasure.” 

7:
However, the penal code does define the term “cruel manner.”  
See 
Tex. Penal Code Ann.
 § 42.09(c)(3).  Cruel manner includes “a manner that causes or permits unjustified or unwarranted pain or suffering.”  
Id.