COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-236-CR

 

 

RICHARD DENNIS SWIFT                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction

Appellant Richard Dennis
Swift appeals his conviction and two-year sentence and a $5,000 fine for
cruelty to animals.  In two issues,
appellant contends that the evidence is factually insufficient to support the
verdict and that the jury charge was fundamentally defective for improperly
defining a word which lowered the State=s burden of proof.  We affirm.








II.  Background Facts

On July 14, 2004, appellant
was at Rodney Dean Swift=s, his
brother=s, house with his nephew. 
Rodney owned a one-year-old black labrador retriever named Bull.  Rodney testified that Bull remained outside
in the backyard when he was not at home. 
At approximately 2:00 p.m., Stephen Gillis and Glenda Sanchez, Rodney=s neighbors, saw Bull running across neighbors= yards with duct tape around his snout and head.  When Bull got to Glenda=s yard, he collapsed, and Glenda, her husband, and Gillis sprayed Bull
off with a hose and attempted to remove the duct tape from his face.  Gillis testified that Bull was breathing
heavily and that he was not responding to their care. 








Soon after Bull collapsed,
Shelly Bailey, an SPCA Texas Humane Services officer, arrived and loaded Bull
into the back of her truck.  As she was
driving down the street en route to the animal hospital, Bailey noticed the
address that was listed on Bull=s dog tags.  Bailey knocked on
the door and after no one responded, she began walking back to her truck when
appellant came to the door.  Bailey asked
appellant if he had duct taped Bull=s snout, and appellant said that he did because he was trying to Ateach him a lesson@ because Bull was barking. 
After learning that Bull had escaped from Rodney=s backyard and that he was injured, appellant unloaded Bull from
Bailey=s truck and loaded him into his van so that he could take him to the
animal hospital.  Dr. Greg Darbro, a
veterinarian at North Colony Animal Clinic, determined that Bull was suffering
from a heat stroke and performed several treatments in an attempt to cool down
his body temperature.  However, after
Bull did not show any signs of improvement, he was transferred to Alma and
Spring Creek Emergency Clinic for overnight observations.  After talking with Dr. Michelle Hazlewood, a
veterinarian at Alma and Spring Creek Emergency Clinic, Rodney decided to
euthanize Bull so that he would not suffer anymore.

On May 18, 2005, a jury found
appellant guilty of the offense of cruelty to animals and assessed his
punishment at two years in a state jail facility and a $5,000 fine. 

III.  Factual Sufficiency

In his first issue, appellant
complains that the evidence is factually insufficient to show that he
intentionally or knowingly muzzled Bull as a form of torture.

A.  Standard of Review








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact-finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 

In performing a factual
sufficiency review, we are to give deference to the fact-finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  








A proper factual sufficiency
review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Applicable Law

Section 42.09 of the penal
code discusses the offense of cruelty to animals.  Tex.
Penal Code Ann. ' 42.09
(Vernon Supp. 2005).  Section 42.09(a)(1)
provides that A[a] person
commits an offense if the person intentionally or knowingly tortures an animal.@  Id. 42.09(a)(1).  

C.  Applicable Facts

At trial, Gillis testified
that on July 14, 2004 at approximately 2:00 p.m., he was getting out of his
truck when he saw Bull running across the yards across the street from his
house.  Gillis stated that Bull had foam
around his mouth, and the tip of his tongue was sticking through his
teeth.  He said that Bull had duct tape
around his mouth and neck and appeared dazed. 
After Bull took off running, Gillis went inside his house and called the
police.  Gillis then went back outside
and noticed that Glenda, a neighbor on the opposite side of the street, had
caught Bull, and Gillis went down to her house to help.  When he arrived, Glenda and her husband were
attempting to cut the tape off Bull=s nose and hosing him down with a water hose.  He stated that the duct tape was on Afairly tight.@  Gillis testified that Bull was panting, his
eyes were glazed, and he was lying on the sidewalk.








Gillis stated that when
Bailey arrived, he helped put Bull in the back of her truck.  After he arrived home, he looked out of his
front window to see what Bailey was doing because she had stopped at Rodney=s house.  Gillis stated that
Bailey knocked on Rodney=s door and
when no one answered, she began walking back towards her truck when appellant
came out of the house.  Although Gillis
could not hear the conversation between Bailey and appellant, he saw that
appellant was getting upset, so he called the police again because he was
afraid that Bailey might have a problem with appellant.  However, Gillis testified that appellant went
back inside and got in his van, and Bailey followed him in her truck.








Glenda testified that she was
getting groceries out of her car when she saw Bull running through her front
yard with foam at his mouth.  She noticed
that Bull had duct tape around his neck and mouth and that his mouth was taped
shut.  Glenda testified that Bull
collapsed on her front yard and that her husband grabbed the dog so that he
could help it.  She noticed that Bull was
having a hard time breathing.  After Bull
collapsed, Glenda and her husband began hosing him down with a water hose and
trying to take the duct tape off his face.[2]  However, Bull did not respond.  Glenda testified that Bull=s hair was coming off with the duct tape, he had blisters on his
mouth, and the vessels in his ears were showing.

Additionally, after Bailey
arrived and put Bull in her truck, Glenda saw Bailey stop in front of the house
that was listed on Bull=s dog
tags.  After appellant answered the door,
Glenda testified that she could hear Bailey and appellant arguing.  After appellant put Bull in his van and drove
off, Glenda followed him to the animal hospital because she was concerned about
where he was taking the dog.








Bailey stated that she was
dispatched at approximately 2:30 p.m. after the animal control received a call
that a black labrador retriever had duct tape around his mouth.  She testified that she arrived approximately
two to three minutes after receiving the call and saw the dog being hosed down.  She said that Bull was not responding to
anything, he was almost unconscious, he was breathing heavily, he had blood
blisters on his mouth, and the blood vessels in his ears had burst.[3]  After observing Bull, Glenda=s husband and Gillis helped her load Bull into the back of her
truck.  After noticing that Bull had dog
tags on, she attempted to call the phone number on the tags; nobody answered,
so she left a message.  However, when she
was driving down the street, Bailey stated that she passed the house that was
listed on Bull=s tags, and
so she reversed, got out, and knocked on the door.  She said that after she began walking away,
appellant answered the door.  Bailey
asked him if he had a black labrador retriever named Bull, and he said
yes.  Bailey then asked appellant if he
was responsible for putting duct tape around his mouth, and appellant said that
he was.  Appellant told Bailey that he
put the duct tape around Bull=s nose because Bull was barking and because he was going to Ateach him a lesson.@

After telling appellant what
had happened, appellant wanted to see Bull, so they walked down to Bailey=s truck.  Bailey testified that
there was still duct tape on Bull=s nose and that appellant pulled the duct tape off and took it
inside.  After appellant came back
outside, he said that he needed to get his van, and appellant and Bailey
unloaded Bull from Bailey=s truck and
put him in appellant=s van.  Bailey followed appellant to North Colony
Animal Clinic to make sure that he was going to take Bull to the
veterinarian.  Bailey stated that after
she left North Colony Animal Clinic, she went to the police department to make
a statement.[4]








Bailey testified that a
muzzle is not a necessary tool to train a dog. 
She further stated that a dog should not wear a muzzle when it is
unattended. Additionally, Bailey testified that she did not think there was any
reason to put duct tape around a dog=s nose.








Dr. Darbro testified that he
began caring for Bull when he was six weeks= old.  He stated that at
approximately 2:40 p.m., appellant and Bailey brought Bull into the clinic and
that Bull was lying on his side, breathing through his mouth, panting very
heavily, and appearing somewhat incoherent. 
Bull did not respond to his name. 
He said that Bull had a temperature of over 107 degrees and that a dog=s normal range of temperature is between 99 degrees and 102 degrees.[5]  After determining that Bull was suffering
from a heat stroke, Dr. Darbro gave Bull a cooling bath, put rubbing alcohol on
the inside of his ears and on his foot pads to help radiate the heat away from
his body, and started him on an IV with chilled fluids.  After approximately twenty minutes of
therapy, Bull=s
temperature dropped to 101 degrees. 
However, Dr. Darbro testified that Bull was not mentally responding very
well and that he was not able to sit up. 
He stated that Bull=s symptoms indicated that he had suffered some brain damage.  Dr. Darbro then administered some medicine in
Bull=s IV to help shrink the size of his brain to help alleviate the
swelling.  He further stated that after
Bull suffered a seizure, he determined that he should be transferred to Alma
and Spring Creek Emergency Clinic for overnight observation.

Dr. Hazlewood testified that
she was Bull=s treating
veterinarian from approximately 7:20 p.m. to 7:50 p.m. on July 14.  She stated that when Bull arrived, he was non
responsive, had bloody diarrhea, had tape marks on his nose, was not able to
lift his head, and had red blotches on his ears and mucus membrane.  She stated that he had a very poor
prognosis.  After talking with Bull=s owners, they decided that the best option would be to euthanize him
so he would not suffer anymore.

Rodney testified that Bull
would scratch on the door and bark excessively when he was left alone.  He stated that he used a bark collar on Bull
when he was going to be left alone or when no one was going to be at home so
that he would not bark.  Rodney stated
that it was an acceptable practice to train a hunting dog with a muzzle so that
the dog would not bark at the birds.








Rodney testified that on July
14, when he arrived at North Colony Animal Clinic, appellant was sitting on the
bench crying and kept saying that he was sorry. 
Rodney stated that appellant had used muzzles on dogs before and that
appellant=s dog,
Domino, had been trained with a duct tape muzzle.  However, Domino=s muzzle had foam on the inside of the muzzle to prevent the duct tape
from sticking on the dog=s hair.  Rodney said that he did not want appellant to
get in trouble.

Stella Moore, a dog trainer,
testified that a muzzle was not designed to stop dogs from barking and that it
should never be used on an unattended dog. 
She said that putting duct tape around a dog=s nose is cruel because it impedes their ability to breathe.








Appellant contends that the
evidence is factually insufficient to establish that he intentionally or
knowingly tortured a dog by placing duct tape around its snout and mouth.  Appellant states that Athe only logical conclusion was that appellant taped the dog=s snout to keep him from barking incessantly and disturbing the
neighbors.@  However, appellant admitted that he had
applied the duct tape to Bull and had told Bailey that he had applied the duct
tape to Ateach [Bull] a lesson.@  Additionally, appellant had a duct
tape muzzle for Domino, but he applied it loosely and had foam on the back so
that it did not stick to Domino=s hair.  However, the duct tape
muzzle that he put on Bull was Avery tight@ and did not
have the foam protection on the inside to prevent Bull=s hair from sticking to the duct tape. 
In fact, Bull=s hair came
out when the duct tape was removed from his nose.  The jury could have inferred from the facts
that appellant intended to torture Bull because he applied the duct tape
tightly on his snout and neck and did not use the foam that he had previously
used on Domino=s
muzzle.  See Manrique v. State,
994 S.W.2d 640, 649 (Tex. Crim. App. 1999). 
Additionally, appellant duct taped Bull=s mouth shut on a hot summer day, and Bull could not even open his
mouth to pant or drink water.  When
viewed neutrally, the evidence is not so obviously weak or so greatly
outweighed by contrary proof that it would not support the finding of guilt
beyond a reasonable doubt.  We overrule
appellant=s first
issue. 

IV.  Jury Charge

In his second issue,
appellant asserts that the jury charge was fundamentally defective because the
term Atorture@ was defined
improperly, which lowered the State=s burden of proof.

A.  Applicable Facts

ATorture@ was defined in the jury charge as, Aevery act or omission whereby unnecessary or unjustifiable pain or
suffering is caused to an animal.@ 

B.  Analysis













Appellant argues that the
State=s burden of proof was lowered because the term Atorture@ was
improperly defined in the jury charge.[6]  Appellant correctly points out that the penal
code does not define Atorture
within section 42.09.@[7]  If a phrase, term, or word is
statutorily defined, the trial court must submit the statutory definition to
the jury.  Moore v. State, 82
S.W.3d 399, 408 (Tex. App._Austin 2002, pet. ref=d); see also Alexander v. State, 906 S.W.2d 107, 111 (Tex. App._Dallas
1995, no pet.).  Words that are not
statutorily defined are to be given their common, ordinary, or usual meaning,
and no specific instruction is required for these terms.  Moore, 82 S.W.3d at 408; see also
Medford v. State, 13 S.W.3d 769, 771-72 (Tex. Crim. App. 2000); Martinez
v. State, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); Roise v. State,
7 S.W.3d 225, 242 (Tex. App._Austin 1999, pet. ref=d), cert. denied, 531 U.S. 895 (2000).  Additionally, jurors are presumed to know and
apply the common and ordinary meaning of words. 
Moore, 82 S.W.3d at 408; see also Cuevas v. State, 742
S.W.2d 331, 346 (Tex. Crim. App. 1987), cert. denied, 485 U.S. 1015
(1988).  








When the law regarding
cruelty to animals was codified in 1974 the Legislature omitted the definition
of torture.  See Act of May 23,
1973, 63rd  Leg., R.S., ch. 399, ' 1, 1973 Tex. Gen. Laws 885; see also State v. Kingsbury, 129 S.W.3d
202, 206 (Tex. App._Corpus Christi 2004, no pet.). 
The term remains undefined in the present statute.  See Tex.
Penal Code Ann. ' 42.09; Kingsbury,
129 S.W.3d at 206.  However, an earlier
version of the animal cruelty statute defined the term torture Ato include every act or omission whereby unnecessary or unjustifiable
pain or suffering is caused to an animal.@  Barnett v. State, 117
Tex. Crim. 358, 35 S.W.2d 441, 443 (Tex. Crim. App. 1931).  Several courts of appeals, albeit in
unpublished opinions, have followed the earlier definition of torture.  See Hansen v. State, No.
05-03-00649-CR, 2004 WL 1353783, at *3 (Tex. App._Dallas
June 17, 2004, no pet.) (not designated for publication); In re J.A.M.,
No. 03-02-00610-CV, 2003 WL 22303115, at *5 (Tex. App._Austin
Oct. 9, 2003, no pet.) (not designated for publication).  Justice is better served by defining words
and phrases that have a known and established legal meaning or that have
acquired a peculiar and appropriate meaning in the law, as where the words have
a well‑known common law meaning.  Breckenridge
v. State, 40 S.W.3d 118, 123 (Tex. App._San
Antonio 2000, pet. ref=d); see
also Medford, 13 S.W.3d at 771-72. 
Because several courts of appeals have extended the earlier definition
of torture to the present statute, we determine that the definition is an
established legal meaning.  Cf.
Breckenridge, 40 S.W.3d at 123.  We
hold that the term Atorture@ was not improperly defined in the jury charge because appellant did
not object at trial and no egregious harm occurred.  Therefore, we overrule appellant=s second issue.

V.  Conclusion

Having overruled appellant=s two issues, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL
A: CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
April 20, 2006











[1]See Tex. R. App. P. 47.4.





[2]Glenda
testified that she had to use scissors to remove the duct tape because she
could not get it off with her hands.





[3]Bailey
testified that a symptom of a heat stroke in dogs is that the blood vessels in
their ears explode.





[4]Michael
Fox, a sergeant with The Colony Police Department, testified that Bailey came
into the police station and wanted to file a cruelty to animals police report. 





[5]Dr.
Darbro testified that the thermometers only went up to 107 degrees and that
Bull=s
temperature was above that, so he could not testify what Bull=s
exact temperature was.





[6]Appellant
contends that the normal meaning of the term torture is found in the
dictionary.  He quotes the dictionary as
defining torture as Aanguish
of body or mind,@ Asomething
that causes agony or pain,@ and Athe
infliction of intense pain to punish, coerce, or afford sadistic pleasure.@ 





[7]However,
the penal code does define the term Acruel manner.@  See Tex.
Penal Code Ann. '
42.09(c)(3).  Cruel manner includes Aa
manner that causes or permits unjustified or unwarranted pain or suffering.@  Id.