AFFIRM; Opinion issued October 10, 2012.



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

———————————

No. 05-11-00871-CR

———————————

**CHARLES PATRICK PAYNE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

———————————————————————————————————

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F09-50173-T**

———————————————————————————————————

# MEMORANDUM OPINION

Before Justices Morris, Francis, and Murphy
Opinion By Justice Murphy

A jury found Charles Patrick Payne guilty of the murder of Dallas Police Officer Norman Smith and assessed punishment at life in prison. In five points of error, Payne contends the trial court erred in: (1) allowing the State to ask three jurors improper commitment questions regarding the range of punishment, (2) failing to instruct the jury on the law regarding execution of arrest warrants, (3) and failing to instruct the jury that mere presence is not sufficient to find criminal activity. We affirm.

## BACKGROUND

Payne killed Smith, an eighteen-year veteran of the Dallas Police Department, when Smith attempted to arrest Payne's cousin, William Jobe, at Payne's apartment. Smith had been trying to

arrest Jobe for several months on an aggravated robbery warrant when, on January 6, 2009, he received information from a confidential informant that Jobe was visiting Payne at his apartment. Although they were at the end of a twelve-hour shift, Smith—along with seven fellow police officers in the gang unit—headed to the apartment to make the arrest. The officers' plan was to knock on the door, get someone to open it, and see who was there. This was a typical method used by the gang unit to execute an arrest warrant. They did not attempt to get a search warrant for the apartment.

The officers involved in the arrest were all wearing gang unit uniforms except for one officer who was wearing a black raid jacket marked with "police" on the front and back with large, white letters. The officers arrived at Payne's apartment complex around 6:00 p.m. One officer testified that "[i]t was a little dark but it wasn't dark to where—the point where we couldn't see." They surrounded the apartment with their guns drawn. Four officers approached the front of the apartment: Smith and Officers Redden, Gomez, and Arellano. Other officers watched the windows of the apartment for attempted escapes. When everybody was in position, Smith quietly approached the door and knocked.

According to Gomez and Redden, Payne asked who was at the door. Smith answered with a fake name, stating it was "Ron" or "Bob." Payne asked again, and Smith again answered with a fake name. Gomez said Payne opened the door, but only about eight inches. Payne made eye contact with Gomez, and then his eyes "focused toward Smith." Payne tried to shut the door, but Smith blocked it. Despite Smith's actions, Payne was able to close the door. Smith then took a step back, loudly yelled "Police!" and kicked the door, though not hard enough to force open the door. Shots were then fired through the door from inside the apartment. Smith was struck between the bridge of his nose and his eye, killing him with "an instantaneously fatal shot." Redden—who was standing close to Smith when he was shot—tried to grab Smith as he fell. Gomez approached Smith,

but the door of the apartment opened again. Gomez could see Payne standing there, and he heard another gunshot. This time, he returned fire. The door to the apartment closed again. At some point during the conflict, Redden also returned fire.

Payne testified he heard a knock on the door and asked who was there. He heard no response, so he got his gun from under the couch. He asked again and heard no response. He then unlocked and opened the door. Payne said that when he opened the door, it hit him on his body and face "[l]ike somebody kicked the door." He stated he never saw who was outside and did not hear anybody yell, "Police!" He thought somebody was trying to "come in on [him]" when the door hit him in the face. He said he reacted by closing the door and firing shots through it. Payne testified he reacted this way because he "fear[ed] for [his] life." He knew that by firing through the door he might hit somebody, but he was scared. After firing, Payne tried to listen through the door, but he could not hear anything. He then "cracked the door" to look out and heard a gunshot. In response, he reached out the door and shot back without seeing who was there. He then closed and locked the door.

Jobe and Jimmy Scarborough, Payne's roommate, were also in the apartment with Payne. Payne had consumed alcohol earlier in the day, and Jobe and Payne had smoked a marijuana "blunt" together. Payne testified, however, that he was neither drunk nor high when the gang unit knocked on his door.

Payne testified that after he shot through the door, everybody in the apartment was "panicky." Payne handed the gun to Jobe, who looked out the back window and saw a person he thought was also trying to rob them.

A few minutes after shots were fired, Payne called 911 and told the operator that someone tried to kick in his door and shoot him. Payne told the 911 operator that he saw two or three people

outside the house. When the operator asked if the police were outside, he said they were not, but he needed them immediately. Payne also testified that during the 911 call, he heard somebody from outside say, "Police, come out." Jobe testified that when Payne called 911, he flushed the drugs he had "on him" down the toilet; he said he knew the police would be there soon. After several minutes, Payne, Jobe, and Scarborough crawled from the apartment and were arrested.

Police officers described Payne's apartment as a "trap house," a house or apartment from which drugs are sold. Like a typical trap house, Payne's apartment had only a few pieces of furniture. Although Payne testified that he, Scarborough, and Jobe "smoked dope" at the apartment, and Jobe testified he sometimes sold drugs from the apartment, Payne denied it was a "dope house."

At trial, Payne admitted to shooting through the door. He argued that he thought he was being "jacked" and did not know it was a police officer. The State charged Payne with capital murder of a police officer and sought the death penalty. The jury convicted Payne of the lesser-included offense of murder and sentenced him to life in prison. This appeal followed.

## DISCUSSION

### Challenges to Jury Commitment Questions

Payne argues in three points of error that the trial court erred in allowing the State to ask improper commitment questions regarding the range of punishment during the voir dire of three jurors. Specifically, the State used a "mercy-killing" hypothetical to contrast different types of murder. According to Payne, by giving the mercy-killing example and then asking the jurors if they could consider the minimum punishment in a case of murder, the State was committing the jurors to consider a minimum sentence based on specific evidentiary facts. The State argues that the mercy-killing hypothetical was not used to bind the jurors to assess any particular punishment, but was used to explain an aspect of the law applicable to the case. Specifically, the State argued that

it was using the example to explain the wide range of punishment available for a murder conviction.

*Standard of Review and Applicable Law*

We review trial court rulings on objections to voir dire questions, including commitment questions, for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). An attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts. *Id.* The purpose of prohibiting improper commitment questions is "to ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005).

Not all commitment questions are improper. *Standefer*, 59 S.W.3d at 181. For example, both the State and defense are entitled to jurors who can consider the entire range of punishment for the particular statutory offense. *Cardenas v. State*, 325 S.W.3d 179, 184 (Tex. Crim. App. 2010). Thus, both sides may question the panel on the range of punishment and may commit jurors to consider the entire range of punishment for the statutory offense. *Id.* Similarly, a question committing a juror to consider the minimum punishment is both proper and permissible. *Id.* Hypothetical questions allow counsel to explain the application of law and may be used for such purpose. *Atkins v. State*, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997) (quoting *Cuevas v. State*, 742 S.W.2d 331, 336 n.6 (Tex. Crim. App. 1987)). Counsel veers into impermissible commitment questions, however, by attempting to commit a prospective juror to consider the minimum sentence based on specific evidentiary facts. *Cardenas*, 325 S.W.3d at 184.

Prospective jurors in this case were interviewed individually, so voir dire continued for many weeks. During portions of the voir dire, the State used a mercy-killing hypothetical with prospective jurors when discussing the potential range of punishment for murder. Payne complains about the questioning of three of those individuals who were selected and served on the jury.

During voir dire of the first of those three jurors, the prosecutor stated:

> The range of punishment for murder in Texas is five years all the way up to life in prison. In order to be qualified you have to be able to say to the Court that you can consider and give the full range if you thought it was the right thing to do.

The prosecutor then explained that "a murder is the same as me taking a gun, shooting co-counsel in the head five times and while he's on the ground laughing at him," adding that "[m]urder is also co-counsel is a very dear friend of mine and he's dying in the hospital—."

Payne then interrupted and objected to the State's voir dire on the grounds that a specific fact scenario was being used to qualify a juror on the range of punishment. The trial court overruled his objection. The prosecutor then stated that it was "not trying to commit [the juror] to say that these facts would require this kind of punishment." Instead, he was trying to explain that:

> murder is the knowingly or intentionally killing of another human being. That can happen different ways . . . . It can be as bad or as good depending on me taking a gun and shooting and laughing and as bad or good as me pulling the plug because he's dying and I knowingly and intentionally take his life.

The prosecutor asked the juror if he could give a punishment as low as five years in prison or up to a life sentence if the facts warranted it. The juror stated that he could.

Similarly, during voir dire of the second juror, the prosecutor explained:

> Straight murder without an aggravating circumstance making it a capital offense is the intentional or knowingly taking of a human life . . . . It can be as bad as on the TV shows where someone kills somebody for wearing the wrong color or because they don't like them and they kill them and they dance around. It could be heinous.

Intentionally or knowingly taking the life can include walking into a hospital room and pulling the plug on a loved one[] because you don't want them to suffer anymore.

Payne once again objected, and the trial court overruled the objection. The prosecutor continued:

So if I am pulling a plug knowing it's going to stop a breathing machine and it's my intent, the jury finds, that that person die so they don't suffer anymore, that's still a murder. You can see there are all kinds of circumstances with regards to these types of cases.

The prosecutor then stated that the jury must keep an open mind.

Finally, during voir dire of the third juror, the prosecutor explained that "someone can be found guilty of a crime and some other person can be found guilty of the same crime but it could be completely two ends of the spectrum." After providing the legal definition of murder, the prosecutor stated:

If I take a gun, I decide I want [a specific district attorney] dead and I take a gun and I shoot her and I cause her death, that's a murder. Heinous murder, sounds bad . . . . On the other end, if I have a family member who is laid up in the hospital because they have got an illness that's causing them pain and I pull that plug to take them out of their misery, that's still an intentional crime, intentional murder, intentional taking of a life, if it's my conscious objective to take their life so that they pass on.

Payne once again objected and was overruled.

The law allows the use of a hypothetical to determine the views of prospective jurors on issues that affect a fair determination of the case; the law does not allow such use to commit the jurors to particular circumstances. *Atkins*, 951 S.W.2d at 789. We therefore must determine the State's purpose in using the quoted illustrations. Payne argues that by giving the mercy-killing description and then asking the jurors if they could consider the minimum punishment for murder, the State was essentially committing the jurors on the range of punishment. The State responds that it used the hypothetical to explain some aspect of the law applicable to the case. We agree with the State's analysis. The hypothetical did not attempt to commit the jurors to resolve an issue a certain

-7-

way on the basis of one or more facts contained in the question. *See Standefer*, 59 S.W.3d at 180. Instead, the hypothetical explained the types of situations that might constitute murder and the reason for such a wide range of punishment. At no point during voir dire did the State ask a question committing these prospective jurors to give Payne the minimum range of punishment based on a specific fact scenario. We overrule Payne's first three points of error.

## Charge Error

Payne asserts in his remaining two points of error that he was harmed by errors in the court's charge. We address these points of error under the same standards.

*Legal Standards and Applicable Law*

The purpose of the jury charge is to instruct the jury on the law that applies to the case and to guide the jury in applying the law to the facts of the case. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PRO. ANN. art. 36.14 (West 2007) (trial court shall give jury "a written charge distinctly setting forth the law applicable to the case"). When reviewing claims of jury charge error, we first determine whether an error actually exists in the charge. *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). In making this determination, we examine the charge as a whole, considering the workable relationship between the abstract paragraphs of the charge—the instructions and definitions—and those applying the abstract law to the facts. *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997); *Caldwell v. State*, 971 S.W.3d 663, 666 (Tex. App.—Dallas 1998, pet. ref'd).

A defendant may call the trial court's attention to errors and omissions in the charge. *See* TEX. CODE CRIM. PRO. ANN. art. 36.14 (West 2007). If error exists and appellant objected to the error at trial, then we determine whether the error caused sufficient harm to require reversal.

*Barrios*, 283 S.W.3d at 350; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984), *superseded on other ground by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988) (if error exists and was preserved, reversal required if error caused "some harm" to appellant from the error). When there is no objection to the error at trial, we will not reverse for jury-charge error unless the record shows egregious harm. *Barrios*, 283 S.W.3d at 350.

*Jury Instruction on Execution of Arrest Warrants*

In his fourth point of error, Payne contends the trial court erred in failing to instruct the jury on the law regarding execution of arrest warrants. At trial, Payne raised the issue of whether the police officers properly followed procedures when they executed Jobe's arrest warrant at Payne's apartment. At the charge conference, Payne requested an instruction that read, "[i]n case of felony, the officer may break down the door of any house for the purpose of making an arrest, if he be refused admittance after giving notice of his authority and purpose." This instruction largely tracked the language of article 15.25 of the code of criminal procedure. *See* TEX. CODE CRIM. PRO. ANN. art. 15.25 (West 2005). Payne also requested a second instruction that read, "If law enforcement is executing an arrest warrant for any individual at a third party residence, they do not have authority to enter absent exigent circumstances or absent a search warrant." The trial court refused both jury instructions.

Payne argues the requested language is relevant to the self-defense instruction in this case, which reads:

> The defendant's belief that the deadly force was immediately necessary is presumed to be reasonable if the defendant: (1) knew or had reason to believe that the person against whom the deadly force was used: (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation . . . .

Payne argues this language in the self-defense instruction charged the jury with deciding whether Smith was unlawfully entering or attempting to enter Payne's apartment, and the requested instruction would have "provided much needed guidance." He further argues that the trial court's failure to include this language in the charge was error.

The trial court should not charge a jury on a defensive theory that is contrary to the law, does not represent an accurate statement of the law, or is immaterial. *Peddicord v. State*, 942 S.W.2d 100, 110 (Tex. App.—Amarillo 1997, no pet.). We conclude the trial court did not err in refusing to include Payne's requested instructions because the requested language was not material and would not have assisted the jury in making any necessary determinations.

Payne never argued at trial that he would have been justified in using self-defense against Smith had he known he was a police officer. Instead, he argued that he did not know Payne was a police officer when he shot him. The charge included instructions on capital murder and the lesser-included offense of murder. The elements in the charge for finding Payne guilty of murder contained all of the elements for finding him guilty of capital murder except for the finding that Smith was a peace officer and Payne knew he was a peace officer. The instructions also stated that if the jury found that Payne "did not know Norman Smith to be a peace officer, then you will find the defendant not guilty of capital murder." Thus, the central determination the jury had to make to find Payne guilty of the lesser-included offense of murder was whether or not Payne knew Smith was a peace officer when he shot him. By finding Payne guilty of the lesser-included offense of murder, the jury implicitly found that the State failed to prove beyond a reasonable doubt that Payne knew Smith was a peace officer. Thus, an instruction regarding whether officers correctly followed procedures in executing an arrest warrant would not have been relevant or helpful in that determination.

—10—

Payne argues that the self-defense instruction charged the jury "with deciding whether Officer Norman Smith was unlawfully entering or attempting to enter" Payne's apartment. This interpretation of what was required of the jury is incorrect. The jury was not charged with deciding whether Smith was unlawfully entering or attempting to enter Payne's apartment; it was charged with determining the reasonableness of Payne's belief that deadly force was necessary based in part on whether Payne knew or had reason to believe Smith was entering his apartment unlawfully. The jury had already found implicitly that Payne did not know Smith was an officer when he shot him. An instruction regarding whether or not the police officers followed proper procedures could have no bearing on whether Payne believed Smith unlawfully entered his apartment. Thus, the requested instruction was immaterial. We overrule Payne's fourth point of error.

*Jury Instruction on "Mere Presence"*

Payne argues in his fifth point of error that the trial court erred in failing to instruct the jury in the self-defense portion of the charge that mere presence is not sufficient to find criminal activity.

At Payne's request, the trial court added a self-defense instruction to the charge. The self-defense language largely tracked the self-defense section of the penal code. *See* TEX. PENAL CODE ANN. § 9.31. In two parts of the charge, the self-defense instruction required the jury to determine if Payne was engaged in criminal activity. The first instance involved the question of whether Payne was reasonable in believing deadly force was immediately necessary. The charge instructed the jury that Payne's belief that deadly force was necessary was presumed to be reasonable if, in part, Payne was not engaged in criminal activity "other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." The second instance where the jury was asked to determine whether Payne was engaged in criminal activity involved the duty to retreat. The charge provided:

A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force.

Payne did not dispute that drugs were found in his apartment. As a result, he contends the jury should have been informed that "mere presence" at the scene where contraband is found does not mean that one is "engaged in criminal activity." This "mere presence" instruction was required, according to Payne, to help the jury interpret the "engaged in criminal activity" language in the self-defense instruction. He further argues that self-defense was a "hotly contested issue"—if the jury had been given proper guidance on this issue, they would have been able to determine the reasonableness of Payne's belief that deadly force was immediately necessary and would have found that he acted in self-defense. He claims that the failure to give this instruction was error that caused "some harm."

We first address whether Payne requested a "mere presence" instruction in the self-defense part of the charge. Payne argues he did. The record establishes the contrary. Payne did request a jury instruction on "mere presence." But his request was directed to the "extraneous offenses" portion of the charge. A request must be sufficient to call the trial court's attention to the omission in the charge. *Stone v. State*, 703 S.W.2d 652, 655 (Tex. Crim. App. 1986).

The trial court had two conferences where the charge was discussed. During the first conference, Payne asked for an "instruction and a paragraph *pertaining to any extraneous conduct* as to mere presence because there's been testimony that William Jobe brought drugs over to the apartment. And we believe we're entitled to an instruction that mere presence at the scene of a crime is no indicia of guilt." (Emphasis added). Later, the trial court asked if there was a "request of an extraneous instruction regarding use of drugs, possession of drugs which was elicited at a time

–12–

outside the time frame of this offense?" Payne answered, "Yes." He explained that "the evidence as it stands right now we believe indicates a mere presence issue. That's why we feel that *in the paragraph pertaining to extraneous offense conduct* raised during the course of testimony that we're entitled to a mere presence charge." (Emphasis added).

The next morning, when the charge conference continued, Payne renewed his request for a "mere presence" instruction in the section regarding extraneous offenses. Payne stated:

> We have one last objection to the Court's charge. On page 8 there is an instruction at the bottom of the page as to extraneous offenses. We believe that the testimony reflects an extraneous offense committed by William Jobe, possession of cocaine, also an extraneous offense of possession of cocaine by Jimmy Scarborough. We would submit to the Court we're entitled to a parties charge in the extraneous offense application reflecting the definition of the law of parties and when a person is criminally responsible for an offense committed by the conduct of another and that we would request an instruction with those mere presence alone does not constitute one a party to an offense.

The trial court denied his request. In this continued conference, Payne did object to language in the self-defense section of the charge that suggested Payne had a duty to retreat in his own home; he did not request a "mere presence" instruction for that section.

After reviewing the record, we conclude that Payne did not request a jury instruction on mere presence in the self-defense portion of the charge. Instead, he requested a "mere presence" instruction in the extraneous offenses portion only. Payne's request for the language as to extraneous offenses was insufficient to alert the trial court to a request for the same language in a separate part of the charge. *See Longoria v. State*, 154 S.W.3d 747, 762 n.15 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (finding that objecting to certain language in one portion of charge insufficiently specific to preserve objection to different language in another portion of charge).

Having concluded that Payne never raised the issue of "mere presence" in the self-defense portion of the charge, we must next determine whether the trial court erred in not sua sponte

instructing the jury on "mere presence." In other words, we must determine whether the trial court had a duty to add this language in the self-defense instructions absent a request to do so. We conclude it did not.

Article 36.14 requires the trial court to deliver to the jury a written charge distinctly setting forth the law applicable to the case. TEX. CODE CRIM. PRO. ANN. art 36.14. That duty exists even when counsel fail to object to inclusions or exclusions in the charge. *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). But a defensive issue is not "applicable to the case" unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge. *See Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). Thus, even if a defensive issue is raised by the evidence, a trial court is not required, on its own motion, to instruct the jury on that defensive issue. *Id.*; *Jackson v. State*, 288 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

"Mere presence" is a defensive issue. *See McShane v. State*, 530 S.W.2d 307, 308 (Tex. Crim. App. 1975). Accordingly, and because Payne did not properly request the instruction, the trial court had no duty to add the "mere presence" language to the self-defense instruction. Payne has failed to show trial court error, and we overrule his fifth point of error.

Having overruled Payne's five points of error, we affirm the trial court's judgment.

_____
MARY MURPHY
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

110871F.U05

—14—



# Court of Appeals
# Fifth District of Texas at Dallas

## **JUDGMENT**

CHARLES PATRICK PAYNE, Appellant

No. 05-11-00871-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 283rd Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
F09-50173-T).
Opinion delivered by Justice Murphy,
Justices Morris and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 10, 2012.

_____
MARY MURPHY
JUSTICE